Maxine Thornton **REESE**, Appellant,

v.

**Larry DUNCAN, Appellee.**

**No. 05–01–01846–CV.**

Court of Appeals of Texas, Dallas.

June 10, 2002.

Donald W. Hicks, Sr., Law Offices of Donald W. Hicks, Sr., P.C., Dallas, for Appellant.

Charles Sartain, Looper, Reed, Mark & Mcgraw, P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for Appellee.

Before Justices LAGARDE, FITZGERALD, and RICHTER.

## OPINION

Opinion By Justice LAGARDE.

In this accelerated appeal in an election contest, Maxine Thornton Reese ("Thornton Reese"), the contestee, raises eight issues in her challenge to the trial court's November 20, 2001 final judgment. She contends the trial court abused its discretion by declaring void the May 5, 2001 election for the Dallas City Council, Place 4, and ordering a new election. For reasons that follow, we resolve all issues against Thornton Reese, affirm the trial court's judgment, and direct the Clerk of the Court to issue mandate instanter.

### BACKGROUND

A general election for Member of Council, Place 4, of the City Council of Dallas, Texas, was held on May 5, 2001. The candidates were incumbent Thornton Reese and contestant Larry Duncan, the immediate past incumbent.[1]

The official canvass of the election showed that of the 3,908 ballots cast, 1,928 votes were cast for Thornton Reese, 1,912 votes were cast for Duncan, and sixty-eight ballots were either overvotes or undervotes.[2] In other words, Thornton Reese won by sixteen votes.[3]

---

1. The election also included a school district race and a proposition regarding city council pay.

2. An overvote is a vote in which the voter voted for both candidates. An undervote is a vote in which the voter did not vote for either candidate.

3. Among the 330 ballots cast in early voting by mail, 247 votes were for Thornton Reese, seventy votes were for Duncan, there were eleven undervotes, and two overvotes. Duncan received the majority of votes in early voting by personal appearance and the major-

ity of votes on election day, but Thornton Reese received the majority of votes from early voting ballots by mail. Place 4 was the only Dallas City Council race on the May 5, 2001 ballot in which early voting determined the outcome of the election. Three precincts (3518, 3528 & 3529) produced the highest margins for Thornton Reese over Duncan in early voting by mail. In these same precincts, early voting in the 2001 Dallas City Council election increased by at least 20 percentage points over early voting in the 1999 Dallas City Council election.

On June 4, 2001, Duncan filed an election contest in which he alleged various voting irregularities. Duncan asked the trial court to determine the true outcome of the election or, alternatively, if the true outcome could not be determined to declare the election void.

On October 26, 2001, Thornton Reese filed a dual no-evidence and traditional motion for summary judgment, which, after a hearing, the trial court denied. After Duncan rested his case in chief, Thornton Reese orally moved for a directed verdict, which the trial court also denied. At the conclusion of the trial, the court found there was insufficient evidence to ascertain the true outcome of the election. Consequently, the trial court declared the election void and ordered a new election. On December 14, 2001, the trial court entered findings of fact and conclusions of law in support of its verdict.[4]

### EVIDENTIARY ISSUES

In her sixth issue, Thornton Reese contends the trial court abused its discretion in declaring the election void because it relied on improperly admitted evidence. We first address those evidentiary issues.

To preserve a complaint for appellate review, the record must show the complaint was presented to the trial court by a timely request, motion, or objection, stating the specific grounds with sufficient specificity, and was adversely ruled upon by the trial court. Tex.R.App. P. 33.1(a); *see McIntyre v. Wilson*, 50 S.W.3d 674, 688 (Tex.App.-Dallas 2001, pet. denied); *Ortiz v. Ford Motor Credit Co.*, 859 S.W.2d 73, 77 (Tex.App.-Corpus Christi 1993, writ denied).

Thornton Reese complains of the testimony of two witnesses: Duncan and Linda James.

### Duncan

■ Thornton Reese argues that because Duncan was not a statistical expert, the trial court erred when it relied on Duncan's statistical testimony in making its findings of fact and conclusions of law. Duncan counters that Thornton Reese did not preserve error regarding her complaint that he was not an expert.

The record shows that Thornton Reese generally objected to Duncan's testimony by stating, "He's not competent to testify as an expert." The trial court *sustained* Thornton Reese's objection and instructed Duncan that he could not testify as an expert about statistical data. Because Thornton Reese obtained a favorable, not adverse, ruling on her objection to Duncan testifying as an expert, she has not preserved error for appellate review.

### Linda James

■ When James was called as a witness, Thornton Reese generally objected that James was not identified as a person with knowledge of relevant facts. Although the trial court did not expressly overrule Thornton Reese's objection, it implicitly did so by allowing James to testify about certain factual matters. The trial court *sustained* Thornton Reese's objections to James's expert opinion testimony or testimony about characteristics of the signatures that were not obvious to the trial court. The trial court repeatedly *sua sponte* admonished James about not providing expert opinion testimony and instructed her on the limitations on her testi-

---

4. The original record filed in this appeal did not include the trial court's findings of fact and conclusions of law notwithstanding Thornton Reese's designation that they be in-

cluded in the clerk's record. Following an order from this Court, the clerk's record was supplemented with the findings of fact and conclusions of law.

mony. The trial court overruled Thornton Reese's objections regarding James's testimony about the characteristics of the letters in the signatures that the trial court could also observe.

On appeal, Thornton Reese contends the trial court erred when it relied on Linda James's expert opinion testimony regarding the genuineness of the signatures.[5] Thornton Reese further contends the trial court reversibly erred in allowing James to testify as an expert, although she was not qualified under the rules as an expert, her opinions were without foundation, and her testimony was of no ostensible value or assistance to the trial court. Duncan responds that although the trial court precluded James from presenting expert testimony, it properly allowed James to testify as a fact witness in which she pointed out different characteristics of the signatures.

Although Thornton Reese complained in the trial court about James testifying as a fact witness, on appeal she complains only about James's testimony as an expert witness, and makes no complaint about her being allowed to testify as a fact witness. Consequently, Thornton Reese has presented nothing for review on her complaint about James's testimony as a fact witness. Further, because Thornton Reese did not obtain an *adverse* ruling on her objection to James's testimony as an expert witness she has not preserved error for appellate review on that issue. We, therefore, resolve the sixth issue against Thornton Reese.

### STANDARD OF REVIEW

■ In an appeal from a judgment in an election contest, the standard of review is whether the trial court abused its discretion. *See Tiller v. Martinez,* 974 S.W.2d

769, 772 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.). In a nonjury case in which both findings of fact and a statement of facts have been filed, we must review the sufficiency of the evidence under the same standards used for jury tried cases. *See Slusher v. Streater,* 896 S.W.2d 239, 243 (Tex.App.-Houston [1st Dist.] 1995, no writ). When reviewing a no-evidence or legal insufficiency point of error, we consider only the evidence and inferences tending to support the dispositive findings and disregard all evidence and inferences to the contrary. *See Slusher,* 896 S.W.2d at 243; *see also Casino Magic Corp. v. King,* 43 S.W.3d 14, 19 (Tex.App.-Dallas 2001, pet. denied). If there is more than a scintilla of evidence supporting the dispositive findings, we must uphold the findings. *See Casino Magic,* 43 S.W.3d at 19.

When reviewing factually insufficient points of error, we consider all the evidence, including evidence contrary to the finding. *See Casino Magic,* 43 S.W.3d at 19; *Slusher,* 896 S.W.2d at 243. We set aside the verdict only if the evidence is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Casino Magic,* 43 S.W.3d at 19; *Slusher,* 896 S.W.2d at 243. In reviewing the trial court's conclusions of law, the standard of review is de novo. *See Richardson Indep. Sch. Dist. v. GE Capital Corp.,* 58 S.W.3d 290, 293 (Tex.App.-Dallas 2001, no pet.)

### ELECTION CONTEST

■ An election contestant has the burden of proving by clear and convincing evidence that voting irregularities materially affected the outcome of the election. *See Tiller,* 974 S.W.2d at 772. In review-

---

**5.** James was offered as a handwriting expert but was allowed to testify at trial only as a fact witness.

ing factual findings based on a clear and convincing standard, the question is whether sufficient evidence was presented to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established. *See Casino Magic,* 43 S.W.3d at 19.

■ In a multi-race election the contestant must first show that (1) illegal votes were counted or (2) an election official prevented eligible voters from voting, failed to count legal votes, or engaged in other fraud, illegal conduct or mistake. *See* TEX. ELEC.CODE ANN. § 221.003 (Vernon 1986); *Miller v. Hill,* 698 S.W.2d 372, 375 (Tex.App.-Houston [14th Dist.] 1985), *writ dism'd w.o.j.,* 714 S.W.2d 313 (Tex. 1986) (per curiam); *see also Tiller,* 974 S.W.2d at 772. The contestant must next show the illegal votes were cast in the race being contested. *Miller,* 698 S.W.2d at 375; *Medrano v. Gleinser,* 769 S.W.2d 687, 688 (Tex.App.-Corpus Christi 1989, no writ). Finally, the contestant must show either a "different result would have been reached by counting or not counting certain specified votes or irregularities were such as to render it impossible to determine the will of the majority of the voters participating." *Goodman v. Wise,* 620 S.W.2d 857, 859 (Tex.Civ.App.-Corpus Christi 1981, writ ref'd n.r.e.).

After the contestant has proved that illegal votes were cast in the contested race, if the trial court can ascertain the true outcome, it must declare the outcome. TEX. ELEC.CODE ANN. § 221.012(a) (Vernon 1986); *Tiller,* 974 S.W.2d at 772; *Medrano,* 769 S.W.2d at 688. In order to determine the true outcome, the trial court may compel the voter to reveal for whom he or she voted. TEX. ELEC.CODE ANN. § 221.009(a) (Vernon Supp.2002); *Medrano,* 769 S.W.2d at 688. Then, the trial court shall subtract the vote from the official total for the candidate for whom the

voter cast his or her vote. TEX. ELEC.CODE ANN. § 221.001(a) (Vernon 1986) *Medrano,* 769 S.W.2d at 688. However, if the number of illegal votes is equal to or exceeds the number of votes necessary to change the outcome the trial court may void the election without attempting to determine how the voters voted. TEX. ELEC.CODE ANN. § 221.009(b) (Vernon Supp.2002); *Medrano,* 769 S.W.2d at 688. The trial court must consider those votes in making its judgment. TEX. ELEC.CODE ANN. § 221.001(a) (Vernon 1986); *Medrano,* 769 S.W.2d at 688. If the trial court cannot ascertain the true outcome of the election, it must declare the election void. TEX. ELEC.CODE ANN. § 221.012(b) (Vernon 1986); *Tiller,* 974 S.W.2d at 772; *Medrano,* 769 S.W.2d at 688.

### Early Voting Ballots by Mail

In her first issue, Thornton Reese contends the trial court abused its discretion in voiding the twenty-one early voting ballots by mail because the evidence is legally and factually insufficient to establish the ballots were the result of official error, mistake or fraud, or voter or candidate abuse or fraud. Thornton Reese argues Duncan has the burden of overcoming the presumption that the elections department acted properly in receiving or rejecting ballots.

In her second issue, Thornton Reese contends subsection 86.006(d) of the election code requiring notation of the date and time the carrier received the official carrier envelope is directory, not mandatory, because there were no findings (i) of voter fraud, (ii) of fraud or abuse by election officials, or (iii) that a particular ballot was untimely delivered or from a prohibited source. *See* TEX. ELEC.CODE ANN. § 86.006(d) (Vernon Supp.2002). Thornton Reese argues the date and hour requirements pertain to the orderly and

prompt conduct of the election process, not to the essence of casting the ballot; thus, the provisions are directory, not mandatory. Further, Thornton Reese argues the votes should be counted if doing so accomplishes the substantial purpose of the statute and the Texas Constitution. Finally, she urges that the date and time notation is discretionary when the early voting clerk accepts the carrier envelope in the absence of fraud or a question regarding the timeliness and source of the ballot.

Duncan contends the trial court correctly held the twenty-one early voting ballots by mail constituted illegal votes due to noncompliance with section 86.006(d) of the election code. See TEX. ELEC.CODE ANN. § 86.006(d). The evidence showed that Virgin Couriers's delivery receipts did not contain the date, hour, and address at which the carrier envelope was received. Duncan argues that section 86.006(d) is mandatory because the legislature has expressly prohibited the counting of an early voting ballot delivered by a carrier without an individual delivery receipt indicating the date, time, and location of pick up. Because our resolution of Thornton Reese's second issue implicates her first issue, we address the second issue first.

### The Statute: Mandatory or Directory?

The legislature has determined the specific method of returning ballots by mail or carrier and has expressly prescribed the consequences for failing to comply by prohibiting ballots returned in violation of this method to be counted. Section 86.006 of the election code prescribes the requirements for returning a marked early voting ballot by mail or common or contract carrier. See TEX. ELEC.CODE ANN. § 86.006 (Vernon Supp.2002).

First, a marked ballot must be returned to the early voting clerk in an official carrier envelope. Id. § 86.006(a). Sec-

ond, the carrier envelope must be delivered by mail or by common or contract carrier. Id. Third, a carrier envelope may not be returned in an envelope or package containing another carrier envelope, but voters who are registered to vote at the same address may return their carrier envelopes together. Id. § 86.006(b), (c). Fourth, each carrier envelope delivered by carrier must be accompanied by an individual delivery receipt that "indicates the date, hour, and address at which the carrier envelope was received by the carrier unless the carrier does not routinely issue a receipt." Id. § 86.006(d). Fifth, a carrier is prohibited from delivering a carrier envelope that originates from the address of: (1) a political party's headquarters; (2) a candidate in the election unless the address is the residence of the early voter; (3) a specific-purpose or general-purpose political committee involved in the election; or (4) an entity that requested the election be held, unless the delivery is a forwarding to the early voting clerk. Id. Section 86.006(e) expressly states "a ballot returned in violation of this section may not be counted."

The validity of the twenty-one early voting ballots depends on whether section 86.006 of the election code is directory or mandatory. If the statute is mandatory, whether there was substantial compliance is not relevant because "provisions deemed mandatory in nature permit no application of the substantial compliance rule." *Kelley v. Scott*, 733 S.W.2d 312, 313–14 (Tex.App.-El Paso 1987, writ dism'd) "The general rule is that the performance of duties placed upon election officials is directory *unless made mandatory by statute*, while those placed upon the voters are mandatory." *Fuentes v. Howard*, 423 S.W.2d 420, 423 (Tex.Civ. App.-El Paso 1967, writ dism'd) (emphasis added).

■ Our function is to interpret and apply the law as written by the legislature. *See Fuentes*, 423 S.W.2d at 423. The Texas Constitution has limited legislative action to legislation "necessary to detect and punish fraud and preserve the purity of the ballot box," and to protect the exercise of free suffrage from "all undue influence ... from power, bribery, tumult or other improper practice." TEX. CONST. art. 6, §§ 2,4; *Mitchell v. Jones*, 361 S.W.2d 224, 227 (Tex.Civ.App.-Texarkana 1962, no writ). "The general rule of interpretation is that the election laws are to be construed as directory in the absence of fraud *or a mandatory provision which requires the voiding of a ballot for failure to comply with its provisions.*" *Kelley*, 733 S.W.2d at 313–14 (emphasis added); *see also Honts v. Shaw*, 975 S.W.2d 816, 822 (Tex.App.-Austin 1998, no pet.) ("the courts have been liberal in construing and enforcing as directory only the provisions of the election laws which are not upon their face clearly mandatory").

When interpreting a statute, we consider the entire statute rather than its isolated provisions. *See Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001). We presume the legislature intends the "entire statute to be effective" and "a just and reasonable result is intended." TEX. GOV'T CODE ANN. § 311.021(2),(3) (Vernon 1998); *Helena*, 47 S.W.3d at 493. Section 86.006 dictates that a "ballot returned in violation of this section may not be counted." TEX. ELEC.CODE ANN. § 86.006(e). The construction code act states "may not" is synonymous with "shall not" and imposes a prohibition unless "the context in which the word or phrase appears necessarily requires a different construction." TEX. GOV'T CODE ANN. § 311.016(5) (Vernon 1998). The context of this statute does not "necessarily require" a different construction; consequently, we construe "may not" to mean "shall not."

■ Thornton Reese's contention that the statute is directory depends upon the absence of mandatory language specifying the consequences for failing to comply. If the legislature included section 86.006 simply to promote prompt, orderly, and proper business conduct, as Thornton Reese suggests, and not to prevent fraud or abuse, then it would not have included language that a violation of the statute results in a ballot not being counted. A ballot returned in violation of section 86.006 is prohibited from being counted. Accordingly, we conclude the statutory requirements of section 86.006 of the election code are mandatory, not directory. *See, e.g., Kelley*, 733 S.W.2d at 313–14 (concluding section 102.002 of the Texas Election Code (Vernon 1986) was mandatory because section 84.001(d) of the Texas Election Code (Vernon 1986), which contained a mandatory provision, included section 102.002); *Fuentes*, 423 S.W.2d at 423–24 (holding former article 5.05, section 15 of the election code, now section 86.010(c), to be mandatory because it contained mandatory language). And because the statute is mandatory, it is irrelevant that there may have been substantial compliance because application of the substantial compliance rule is not permitted. *See Kelley*, 733 S.W.2d at 313–14. We resolve the second issue against Thornton Reese.

*Sufficiency of the Evidence*

■ The trial court filed findings of fact and conclusions of law. In finding of fact number eleven, the trial court found that on May 3, 2001, twenty-one carrier envelopes purporting to be those of specifically named voters, including their precincts, were delivered by courier to the Dallas County Elections Department. The trial court also found: (1) the envelopes were delivered by Virgin Couriers, a com-

mon or contract carrier; (2) the individual delivery receipt that accompanied each carrier envelope did not indicate the date, hour, and address at which the envelope was received by the carrier; (4) the Dallas County Elections Administrator, who was not present at the May 5 election, would have rejected the carrier envelopes for non-compliance with the requirements of section 86.006(d) of the Texas Elections Code; (5) the absence of any rejection notation on the envelopes infers that none of the envelopes was rejected by the Dallas County Early Voting Ballot Board; and (6) in the absence of any notation to the contrary each envelope contained one and only one ballot.

Copies of the official carrier envelopes show a stamp stating "ENT'D MAY 03 2001" and a label stating the voter's name, address, registration number, precinct number and date of the election. In the absence of any notations to the contrary, we assume a ballot was in the carrier envelope and the ballot was accepted. The evidence shows the following regarding the twenty-one early voting ballots in question that were admitted into evidence at trial: They were picked up and delivered by Stacey Simmons, an employee of Virgin Couriers, a common or contract carrier; Virgin Couriers routinely issues receipts; Virgin requires the couriers to use receipts for deliveries; each carrier envelope in question had an individual receipt; the individual receipts were completed by someone at a house on Dunbar where Simmons picked up the envelopes; Charlotte Ragsdale called the Virgin Couriers' dispatcher for a pick up at 3611 Dunbar for delivery to the elections department; Ragsdale picked up a few ballots for Tom Whatley's school board race in precinct

3517; the ballots did not originate from a prohibited source; Ragsdale's home was not a campaign headquarters, nor was she a candidate in the election.

Twenty of the twenty-one individual receipts did not show the date, hour, and address at which Virgin Couriers picked up the official carrier envelope. One of the receipts showed the date but not the hour and address of pick up. Bruce Sherbet, the Dallas County Elections Administrator who was designated as an elections expert at trial, testified the twenty-one ballots in question should have been rejected because they did not comply with state law and that the elections department employee made a mistake in accepting them.[6]

Thornton Reese contends the elections department did not make a mistake in accepting the ballots. However, Duncan's burden was to show by clear and convincing evidence only that illegal votes were counted *or* an election official made a mistake. Because we have earlier concluded section 86.006 is mandatory, the trial court properly concluded the twenty-one early voting ballots constituted illegal votes because they did not comply with the mandatory requirements of section 86.006 of the election code. Because the evidence supports that conclusion of law and, further, because the evidence supports a finding of fact that the illegal votes were counted, it is not necessary to address whether an election official made a mistake. Because the evidence is legally and factually sufficient to support the trial court's findings of fact, the trial did not abuse its discretion. We resolve the first issue against Thornton Reese.

### Unconstitutionality of the Statute

■ In her third issue, Thornton Reese contends section 86.006 of the elec-

6. At the June 2, 2001 election Sherbert rejected similar ballots after speaking to the Secretary of State about the problem.

tion code is unconstitutional both facially and as applied. Specifically, she argues section 86.006 violates (i) the due process and equal protection clauses of the Fourteenth Amendment of the U.S. Constitution, (ii) the general voting rights principles set forth in the Voters Rights Act of 1965, and (iii) the federal "substantial compliance" principles articulated in *Bush v. Palm Beach Canvassing Bd.*, 531 U.S. 70, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) and *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). *See* U.S. CONST. amend XIV, § 1; 42 U.S.C.A. § 1971 (1994). Duncan contends Thornton Reese's arguments were not properly preserved in the trial court and cannot be considered on appeal.

Although Thornton Reese generally challenged the constitutionality of section 86.006 of the election code in the trial court, she did not raise the specific constitutional claims she now raises in this appeal. Because she did not make these specific claims in the trial court, we do not address Thornton Reese's constitutional claims. *See Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex.1993); *McIntyre*, 50 S.W.3d at 688; *see also* TEX.R.APP. P. 33.1(a).

### Signature Discrepancies

In her fourth issue, Thornton Reese contends the trial court abused its discretion in disqualifying eleven ballots because the evidence is legally and factually insufficient to support the trial court's findings of fact that the early voting ballot applications and/or carrier envelopes were not signed by the voter. Thornton Reese appears to challenge findings of fact numbers twenty-three, twenty-four, and twenty-five. In those findings, the trial court found that "either the ballot application or the carrier envelope or both" were not signed by nine specifically named voters. The trial court also found that the ballot applications of

two pairs of specifically named voters were signed by the. same person. The trial court based its findings on its own examination of the signatures and on trial testimony. The trial court concluded the early voting ballots by mail constituted illegal votes and they were counted due to a mistake by an election officer.

Thornton Reese argues the signatures on the ballot applications and carrier envelopes are not different enough to require reversal of the decision of the signature-verification committee that accepted the ballots. She argues Duncan must overcome the presumption that the election officials properly discharged their duty in receiving or rejecting a ballot. Further, Thornton Reese argues the trial court applied an incorrect standard to determine signature discrepancy on the ballot applications of the two pairs of voters because it improperly compared one voter's signature with another voter's signature.

To be entitled to vote an early voting ballot by mail, the application must be signed by the eligible voter. TEX. ELEC. CODE ANN. § 84.001(b) (Vernon Supp.2002). A witness may sign for the voter if the voter cannot sign due to a physical disability or illiteracy. *Id.* § 1.011(d). A person who fails to comply with section 84.001 of the election code is not entitled to receive an early voting ballot by mail. *Id.* § 84.001(f). A voter is required to sign the certificate on the carrier envelope after it is sealed. *Id.* § 86.005(c). After the early voting clerk delivers the early voting ballots by mail to the early voting ballot board, the board accepts a ballot, among other requirements, if neither the voter's signature on the application nor the signature on the carrier envelope is "determined to have been executed by a person other than the voter, unless signed by a witness." *Id.* § 87.041(b)(2). If the board

rejects a ballot, it shall enter "rejected" on the carrier envelope. *Id.* § 87.041(d).

■■■■■■ The contestant must overcome the presumption that the early voting ballot board or signature-verification committee acted properly in rejecting or accepting ballots. *See Alvarez v. Espinoza*, 844 S.W.2d 238, 244 (Tex.App.-San Antonio 1992, writ dism'd w.o.j). The contestant must show that the board erred. *See id.* In determining whether there is a signature discrepancy involving an early voting ballot, the trial court may hear testimony from the voter or other witnesses on the similarity of the signatures and may compare the signatures to refute the signature verification committee's decision. *See Tiller*, 974 S.W.2d at 777; *Alvarez*, 844 S.W.2d at 245. When the signatures clearly appear to be different, the trial court may compare the signatures on its own and determine the validity without hearing testimony from the voter or other witnesses regarding the similarity of the signatures. *See Tiller*, 974 S.W.2d at 777; *Alvarez*, 844 S.W.2d at 245. To determine whether the trial court abused its discretion, we must review and compare each signature on the early voting ballot applications and carrier envelopes the trial court found to be non-genuine to ascertain whether the signatures are similar enough (i) to compel the conclusion that the same person signed them, or (ii) to override the trial court's conclusion that the same person did not sign them. *See Alvarez*, 844 S.W.2d at 245; *cf. Tiller*, 974 S.W.2d at 777 (applying the standard of review in a case in which the trial court found the election judge improperly rejected the ballots). We do not determine the credibility of any witness or substitute our judgment for that of the trial court. *See Tiller*, 974 S.W.2d at 777.

■■■■ Applying the above law to the facts of this case, the evidence shows the trial court had access to photocopies and photographs of the ballot application, carrier envelope, and voter registration application for each challenged signature. Linda James, testifying only as a fact witness, pointed out the similarity and dissimilarity of the letters in some but not all of the challenged pairs of signatures. Bruce Sherbet testified that a two-person signature-verification committee compares the signatures on the carrier envelope and ballot application to determine if they were signed by the same person. They spend ten to fifteen seconds comparing the signatures looking for common traits. If the ballot is accepted, each person on the signature-verification committee initials the label affixed to the carrier envelope or "ballot courier envelope." If they do not agree, then the application and carrier envelope are sent to the early voting ballot board. Then the ballot board makes the determination of whether to accept the ballot. Each of the eleven contested ballots shows a label and initials on the label. The evidence shows the signature-verification committee compared the signatures and accepted the ballots.

Thornton Reese argues that James's testimony was insufficient to support the trial court's findings. On cross-examination, James testified she did not know any of the voters, nor was she familiar with their medical history, the writing surface used when the signature was made, the writing instrument used, or what the voters were doing when they signed the forms. Thornton Reese argues that any one of these factors could have caused differences in the voter's signatures. Also, the voters did not testify. Because it was within the trial court's discretion to compare signatures without the aid of other testimony, it was not necessary that the voters testify. *See Tiller*, 974 S.W.2d at 777. Further, Duncan's burden was to

prove by clear and convincing evidence that the signatures were dissimilar, not to show why the signatures might be different. Thornton Reese could have refuted Duncan's evidence by presenting controverting evidence showing that the signatures were genuine, but she did not.

Having reviewed and compared each pair of challenged signatures in the trial court's finding of fact number twenty-three, we conclude none of the pairs of signatures are similar enough to compel the conclusion that the voter signed the ballot application or carrier envelope or both, or to override the trial court's finding that either the ballot application or the carrier envelope or both were not signed by the voter. The evidence was legally and factually sufficient to support the trial court's finding of fact. Accordingly, the trial court did not abuse its discretion.

In findings of fact numbers twenty-four and twenty-five, the trial court found the ballot applications of the challenged voters were signed by the same person; thus, one or both applications were not signed by the voter. The trial court compared the signatures of one voter's ballot application against the signatures of another voter's ballot application. The voter's carrier envelope and voter registration application were also available to the trial court for signature comparison. The early voting ballot board and signature-verification committee are limited in their scope of inquiry. *See* TEX. ELEC.CODE ANN. §§ 87.027(i), 87.041(e) (Vernon Supp.2002) (may compare the signature on the carrier envelope against the signature on the ballot application; may compare these signa-

tures with the signature on the voter's registration application to confirm the signatures match). The trial court, on the other hand, has broad discretion in determining whether illegal votes were counted. *See* TEX. ELEC.CODE ANN. § 221.003(a) (scope of inquiry); *see e.g., Tiller,* 974 S.W.2d at 777 (the trial court can hear oral testimony regarding signatures). Having reviewed and compared each pair of challenged signatures in these findings of fact, we conclude the signatures on the ballot applications of each pair of voters are not different enough to compel the conclusion that different persons signed the ballot applications, or to override the trial court's conclusion that the ballot applications were signed by the same person. The evidence was legally and factually sufficient to support the trial court's findings of fact numbers twenty-four and twenty-five. Accordingly, the trial court did not abuse its discretion. We resolve the fourth issue against Thornton Reese.

## Election Outcome

In her fifth issue, Thornton Reese contends the trial court abused its discretion in declaring the election void because the evidence is legally and factually insufficient to show that the thirty-two [7] disqualified ballots contained votes cast in the Place 4 Dallas city council election, which candidate received the votes, and that the votes made a difference in the election. Thornton Reese argues the trial court could have based its decision that the election was void on ballots that were: (i) not cast in the Place 4 city council election, (ii)

---

**7.** There were thirty or thirty-two possible illegal votes depending on whether the voter signed his or her ballot application and another voter's application or did not sign either application. The trial court found that two sets of ballot applications were signed by the same person. Thus, either one or both appli-

cations were not signed by the voter. Consequently, there are two or four illegal votes. Also, another seven votes were illegal because the signatures did not match. Finally, the trial court found that twenty-one votes were illegal because they did not comply with section 86.006 of the election code.

rejected, or (iii) counted as undervotes or overvotes.

Duncan, of course, contends the trial court properly exercised its discretion when it declared the election void without attempting to ascertain how particular illegal votes were cast. Duncan correctly contends the trial court is not required to ascertain for whom a particular vote was cast if the number of illegal votes is equal to or exceeds the margin of victory. The thirty votes [8] the court concluded were illegal exceeded Thornton Reese's sixteen vote margin of victory. The trial court also considered that the undervotes and overvotes might be included in the illegal votes.

■ A contestant can show for whom a particular vote was cast to determine the true outcome of the election or the contestant can show the illegal votes exceed the margin of victory. *See* TEX. ELEC.CODE ANN. § 221.009 (Vernon Supp.2002); *Miller*, 698 S.W.2d at 375; *Goodman*, 620 S.W.2d at 859. The trial court "may declare the election void without attempting to determine how individual voters voted" if the number of illegal votes is equal to or greater than the number of votes necessary to change an election's outcome. TEX. ELEC.CODE ANN. § 221.009(b). Thus, when it is shown that the number of illegal votes is equal to or greater than the number needed to change the outcome, the trial court is not required to hear the voter's testimony to determine how the voter vot-

ed. *See Green v. Reyes*, 836 S.W.2d 203, 209 (Tex.App.-Houston [14th Dist.] 1992, no writ); *Medrano*, 769 S.W.2d at 690.

■ Thornton Reese argues the thirty-two ballots in question did not materially affect the outcome because the evidence is legally and factually insufficient to show whether any of the illegal votes were included in the seventeen early voting ballots by mail that were rejected by the ballot board.[9] In addition, the two overvotes and eleven undervotes were not included in the vote totals. Thornton Reese contends the only way to determine whether a vote was cast in a particular race is by requiring the voter to reveal his or her vote. Without the voters' testimony about how they voted, Thornton Reese contends it cannot be determined for whom they voted in the election. She asserts that notwithstanding the fact that the elections department maintains voter history records that show in which election the voter participated, Duncan did not present the voter history record for all thirty-two voters.

The record reflects the following facts: the official canvassing report shows Thornton Reese received 1,928 votes and Duncan received 1,912 votes, giving Thornton Reese a sixteen-vote margin of victory; the thirty-two illegal votes were from voters who voted in the Dallas city council, Place 4 race in the May 5, 2001 election; exhibit five,[10] which included the thirty-two

8.  Allowing for the possibility that two voters signed their ballot applications, Duncan employs the lowest possible number of illegal votes, which was thirty.

9.  Thornton Reese made this factual assertion in her statement of facts. Although Duncan generally challenged all of Thornton Reese's factual assertions not supported by the record and specifically challenged several of Thornton Reese's factual assertions, he did not challenge this particular fact. We must accept as

true the facts stated in an appellant's brief unless another party contradicts them. TEX. R.APP. P. 38.1(f). Because both Thornton Reese and Duncan discuss the seventeen rejected ballots as an established fact, we will accept as true that seventeen early voting by mail ballots were rejected.

10.  Exhibit five contained the challenged voters' ballot applications, carrier envelopes, voter registration applications, and courier receipts if applicable.

illegal votes, represented voters who cast early voting ballots by mail in the Dallas city council, Place 4 race of the May 5, 2001 election; unless otherwise indicated, each carrier envelope contained a ballot; the voter's history record indicates the election in which the voter participated in although it is not "100 percent" accurate; [11] if the voter did not cast a vote for anyone on the ballot it would be counted as an undervote and the voter's history record would indicate the voter participated in that election; none of the illegal votes were rejected because there were no notations to the contrary; and the trial court considered the undervotes in determining the number of illegal votes.

The trial court inferentially found that none of the illegal votes was rejected because there was no notation by the ballot board indicating rejection. Of the 330 votes cast by early voting by mail, there were two overvotes and eleven undervotes. The trial court identified twenty-one voters whose carrier envelopes did not comply with section 86.006(d) of the election code. The trial court identified seven voters whose individual ballot application, carrier envelope, or both were not signed by that particular voter. The trial court identified two pairs of voters in which the ballot applications were signed by the same person, thus one or both applications were signed by the voter. There was no witness signing for the voters. The trial court did not attempt to ascertain whether the voter signed the ballot applications or carrier envelopes because the number of illegal votes exceeded the margin of victory. The trial court found the carrier envelope and presence or absence of notations a more reliable indicator of whether the voter cast an early voting ballot by mail than the voter history records. Finally, the trial court found the evidence was insufficient to determine the true outcome of the election.

Although the trial court did not make a specific finding of fact regarding whether the illegal votes were cast in the Dallas city council, Place 4 race, the omitted finding will be presumed in support of the judgment if the evidence supports the finding. *See* Tex.R. Civ. P. 299.[12] The evidence shows that the illegal votes were cast in the Dallas city counsel, Place 4 race of the May 5, 2001 election. Although some of the illegal votes may have been counted as undervotes, the evidence shows the trial court considered this possibility and compensated by finding more than twenty-seven illegal votes (sixteen vote margin plus eleven undervotes). Because the evidence supports the finding, we presume the trial court found the illegal votes were cast in the Place 4 city council election.

Having reviewed the evidence supporting the trial court's findings, we conclude there is more than a scintilla of evidence supporting the findings. Further, based on all the evidence, we conclude the evidence is sufficient to produce in the trial court's mind a firm belief or conviction as to the truth of the allegations sought to be established. The trial court's findings of fact support its conclusions of law that it could not determine the true outcome of the election and the number of illegal votes

**11.** The better method to determine whether the voter participated in a particular election is to review signature rosters or look at application for ballot by mail.

**12.** The record reflects that Thornton Reese did not request additional findings of fact. Because she did not request additional findings of fact, the omitted finding will be implied provided it is supported by the evidence. *See* Tex.R. Civ P. 299; *Hawkins v. Comm'n for Lawyer Discipline,* 988 S.W.2d 927, 938 (Tex. App.-El Paso 1999, pet. denied), *cert. denied,* 529 U.S. 1022, 120 S.Ct. 1426, 146 L.Ed.2d 317 (2000).

was greater than the number of votes necessary to change the outcome of the election. Consequently, the trial court did not abuse its discretion by declaring the election void and ordering a new election. We resolve the fifth issue against Thornton Reese.

### DENIAL OF MOTION FOR SUMMARY JUDGMENT

██ In her seventh issue, Thornton Reese contends the trial court abused its discretion in orally denying her no-evidence motion for summary judgment. If the trial court denies a motion for summary judgment and the case is tried on its merits, the order denying the summary judgment is not reviewable on appeal. *See Carr v. Weiss*, 984 S.W.2d 753, 760 (Tex. App.-Amarillo 1999, pet. denied); *Steinberg v. Medical Equip. Rental Services, Inc.*, 505 S.W.2d 692, 695 (Tex.Civ.App.-Dallas 1974, no writ). Accordingly, we do not address this issue. Nothing being presented for review, we resolve the seventh issue against Thornton Reese.

### DENIAL OF MOTION FOR DIRECTED VERDICT

In her eighth issue, Thornton Reese contends the trial court abused its discretion in denying her motion for directed verdict. The record reflects that after Duncan rested Thornton Reese made an oral motion for directed verdict. The arguments Thornton Reese makes on appeal were also made in her motion for directed verdict.

██ A complaint that the trial court erred in denying a motion for directed verdict is "in essence a challenge to the legal sufficiency of the evidence." *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 187 (Tex.App.-Dallas 1996, no writ). When the appellate court reviews the denial of a motion for directed verdict, it is limited to the specific grounds stated in the motion. *See Cooper v. Lyon Fin. Services, Inc.*, 65 S.W.3d 197, 207 (Tex.App.-Houston [14th Dist.] 2001, no pet.)

Because in issues one through five we have already concluded the evidence was legally sufficient to support the trial court's findings of fact and conclusions of law, we necessarily conclude the trial court did not abuse its discretion in denying Thornton Reese's motion for directed verdict. *See, e.g., In re J.O.C.*, 47 S.W.3d 108, 116–17 (Tex.App.-Waco 2001, no pet.) (having previously found in the opinion that the record contained legally sufficient evidence to support the ground stated in the motion for directed verdict, the trial court did not err in denying the motion). Accordingly, we resolve the eighth issue against Thornton Reese.

### DUNCAN'S REQUEST THAT NO MOTIONS FOR REHEARING BE ENTERTAINED AND MANDATE ISSUE INSTANTER

Duncan requests this court to order that no motion for rehearing be entertained and to issue mandate instanter. Duncan argues that the process needs to be expedited because the city council term expires on June 9, 2003. Thornton Reese did not respond to Duncan's request.

Because our judgment is conclusive and timely resolution of this case is required, no motion for rehearing will be entertained. *See* TEX. ELEC.CODE ANN. § 232.014(e) (Vernon 1986); TEX. ELEC. CODE ANN. § 231.009 (Vernon 1986); *see also* TEX.R.APP. P. 49.4. We direct the Clerk of the Court to issue mandate immediately. *See* TEX.R.APP. P. 18.1(c); TEX. GOV'T CODE ANN. § 22.225(b)(2) (Vernon Supp.2002); *see, e.g., Green*, 836 S.W.2d at 214 (the appellate court issued mandate and stated it would not entertain any motions for rehearing).

We affirm the trial court's judgment.