Irene PERLMAN, as substitute for William Perlman, Plaintiff–Appellant,

v.

PIONEER LIMITED PARTNERSHIP and Kendrick Cattle Company, Defendants–Appellees.

No. 89–2978.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1990.

Rehearing Denied Jan. 23, 1991.

---

**11.** *McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. at 1823.

**12.** 450 U.S. at 248, 101 S.Ct. at 1089.

**13.** 835 F.2d at 793.

**14.** *Id.* at 798. *But see Gaballah v. Johnson,* 629 F.2d 1191 (7th Cir.1980).

William H. White, Ruth L. Richard, Susman & Godfrey, Houston, Tex., for plaintiff-appellant.

David S. Steefel, David B. ˙ Wilson, Holme, Roberts & Owen, Denver, Colo., Barry G. Flynn, Houston, Tex., for defendants-appellees.

Before JONES, DUHÉ, and WIENER, Circuit Judges.

PER CURIAM:

William Perlman (Perlman) filed this diversity suit for a declaratory judgment against Pioneer Limited Partnership (Pioneer) and Kendrick Cattle Company (Kendrick) seeking to have an oil and gas lease and a surface lease declared unenforceable due to an alleged occurrence of a force majeure. He claimed that his performance of the contract had been hindered by state regulations in Wyoming and Montana. Pi-

oneer and Kendrick counter-claimed for breach of contract seeking the amounts promised under the agreements, statutory penalties and attorney's fees. The district court found for Pioneer and Kendrick on all claims and ordered judgment against Perlman for $1,772,676.65. We affirm the district court's finding that Perlman breached his contract with Pioneer and Kendrick, but reverse the district court's award of attorney fees except for those awarded pursuant to Mont.Code Ann. § 82-1-202 in the amount of $2,500.

## I.

Pioneer entered into an Oil and Gas Lease (the Lease) with Perlman to "explore, drill, prospect and operate" for oil and gas on acreage located in Montana and Wyoming. In return for these rights, Perlman agreed to (1) pay Pioneer $137,676.65 in initial rent, and (2) spend $1,500,000 in exploring and developing the acreage or, alternatively, to pay Pioneer the difference between $1,500,000 and the amount he spent. Perlman also obtained from Kendrick the right of access to and use of land in Wyoming and Montana overlying and adjoining Pioneer's acreage (the Surface Agreement) and in exchange, agreed to pay Kendrick $60,000. Incorporated into the Lease was a "force majeure" clause which states in pertinent part:

> 14. FORCE MAJEURE ... This lease shall not be terminated ... nor Lessee held liable in damages ... if compliance [with covenants in lease] ... is prevented or hindered by an act of God, of the public enemy, adverse field, weather or market conditions, labor disputes, inability to obtain materials in the open market or transportation thereof, **inability to obtain governmental permits or approvals necessary or convenient to Lessor's operations** ... such circumstances

of events being hereafter referred to as "force majeure".... Lessee shall notify Lessor in writing ... within fifteen (15) days of any force majeure which prevents or hinders any compliance, activity or event hereunder.... Lessee shall use all reasonable efforts to remove such force majeure ...

Perlman obtained the right to produce oil and gas from all the depths and horizons subject to the lease. No one particular method to produce oil and gas was designated in the lease; however, Perlman anticipated using his patented "Perlman Process" to produce coal seam gas.[1] This process involves: (1) the injection of water into the ground during the drilling process (the fracturing phase), and (2) the production of water and gas resulting from the fracturing phase. This process usually produces substantial amounts of water. Apparently, other methods used in Wyoming to produce coal seam gas do not yield as much water.

After the Lease was signed, the Taylor 24 well in Wyoming was completed using the Perlman process.[2] Taylor 24 was not on the Pioneer/Kendrick tract and in fact was over 85 miles away from the subject acreage. Taylor 24 was drilled into a fault and, therefore, did not produce gas as expected, but produced only large volumes of water. Due to the substantial amounts of water produced by Taylor 24, the Wyoming Oil and Gas Conservation Commission (the Commission) ordered the owners either to permit the well as a water well or plug it.[3] Pursuant to this order, the Wyoming officials requested a meeting (the October 26 meeting) with the parties having an interest in Taylor 24 to discuss the operations of that well.

The primary focus of this meeting between the Perlman representatives and the Wyoming officials was the problems associ-

---

1. A consultation agreement between Perlman and Pioneer stated that Perlman's primary purpose in obtaining the oil and gas lease was to test the Perlman Process. However, neither the consultation agreement nor the Lease stated that testing the Perlman process was the sole purpose of the contract or that Perlman could only use his process to obtain coal seam gas.

2. This well was not associated with Pioneer or Kendrick but it connected with the same aquifer as the Pioneer tract—the Fort Union Formation and its associated aquifer.

3. Perlman and the operator, Woods Petroleum, chose not to permit the well as a water well or sell it to an area rancher as a water well, but rather chose to plug and abandon it.

ated with the Taylor 24 well; however, the proposed wells on the Pioneer/Kendrick acreage apparently were discussed as well. While the reports of what was actually discussed at the meeting conflict, it is clear that at the very least the State Engineer and the Commission required, *inter alia*, that studies be done for all of Perlman's proposed operations before the state could determine the impact of Perlman's operations and decide how the wells should be permitted. Primarily, the Wyoming officials requested more information in order to determine the effect of the Perlman process on Wyoming's water resources in the areas that Perlman planned to drill. Apparently this is a standard request of anyone using or who has the potential of using substantial amounts of water in Wyoming. Hydrology studies were the most pertinent studies needed and had to be done for the entire region affected by the drilling. Costs of these studies were estimated to be $50,000 to $200,000 per well.

After hearing the results of the meeting, Perlman concluded unilaterally that the actions of the Wyoming regulators hindered his performance under the contract. He also unilaterally concluded that because Montana regulated its water similarly or more stringently than Wyoming, he would also be hindered there. On the basis of such unilateral decisions, Perlman invoked the force majeure clause taking the position that he was no longer bound to perform under the Lease or the Surface Agreement. He notified Pioneer and Kendrick in December 1987 of the purported occurrence of the force majeure and filed this suit for declaratory judgment in April 1988.

At trial the district court rejected Perlman's force majeure argument on findings that Perlman made no effort whatsoever to drill on the lease even though he may not have encountered the same quantity of water as he did on the Taylor 24, and that Perlman failed to give timely notice of the

force majeure. The court also found that, as a matter of law, the doctrine of force majeure did not excuse Perlman's failure to perform under the Lease because the circumstances alleged did not constitute force majeure and the event complained of was foreseeable to Perlman and within his control. The district court also found as a matter of law that Section 8 of the Lease was not unenforceable as a penalty.[4] The district court therefore awarded Pioneer $137,676.65 plus interest pursuant to Section 2 of the Lease and $1,500,000 plus interest pursuant to Section 8 of the Lease. Pioneer was also awarded $100 for statutory penalties as a result of Perlman failing to file a required disclaimer. Kendrick was awarded $60,000 plus interest pursuant to the terms of the Surface Agreement. Finally, the district court awarded Pioneer and Kendrick a total of $75,000 for attorney's fees.

Perlman appeals claiming that the district court erred in finding that his performance was not excused by force majeure under the terms of the contract.

## II.

### Standard of Review

We uphold the trial court's finding of fact unless clearly erroneous giving due regard to the district court's credibility determinations. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Even though we might have weighed the evidence differently had we been sitting as trier of fact, we must accept the district court's findings as long as they are plausible in light of the record viewed in its entirety. *Id.* The trial court's conclusions of law we review de novo. *United States, Small Business Admin. v. Bridges*, 894 F.2d 108, 111 (5th Cir.1990); *Halloran v. Veterans Admin.*, 874 F.2d 315, 320 (5th Cir.1989).

---

4. Section 8 of the Lease reads:
   (a) Lessee agrees that during the continuancy of this lease lessee shall expend the sum of One Million Five Hundred Thousand dollars ($1,500,000) in direct costs and expendi-

tures.... In the event that Lessee does not expend said sum of $1,500,000 as aforesaid during the continuancy of this lease, Lessee will pay to Lessor the difference between $1,500,000 and the amount so expended.

**1248**

Except for Pioneer's claim for attorney's fees under Mont.Code Ann. §§ 82–1–201 and 82–1–202, this action is governed by the law of the state of Wyoming as agreed upon in the contract. Unfortunately, there is a dearth of Wyoming caselaw dealing with the issues of this appeal. Therefore, we must look to the law of other common-law jurisdictions, as would the state courts in Wyoming, to supply the rules of law.

### III.

*Force Majeure*

■ At trial, the district court held that under the doctrine of force majeure Perlman's performance was not excused because the event complained of was within Perlman's control and was entirely foreseeable. The court also determined that Perlman could have performed because performance had not been rendered impossible or untenable. The district court rested its holding on the general principle that "a force majeure clause is to relieve [a] lessee from harsh termination due to circumstances beyond [his] control that would make performance untenable or impossible." *Edington v. Creek Oil Co.*, 213 Mont. 112, 690 P.2d 970 (1984). As Perlman aptly argues, however, the district court erred in using the "doctrine of force majeure"[5] to interject terms into the contract that were not contemplated by the parties. Therefore, he urges, control and foreseeability are not at issue. The only issue in this instance, insists Perlman, is whether he was hindered by governmental regulations in his efforts to fulfill the contract.

■ Perlman is correct that this case is essentially one of contract interpretation. The language in the force majeure clause in the Lease is unambiguous and its terms were specifically bargained for by both parties. Therefore, the "doctrine" of force majeure should not supersede the specific terms bargained for in the contract.[6] When the terms of a contract are unambiguous, the courts must give effect to the intentions of the parties expressed by the language they employ. *Quin Blair Enterprises, Inc. v. Julien Constr. Co.*, 597 P.2d 945, 951 (Wyo.1979). Because the clause labelled "force majeure" in the Lease does not mandate that the force majeure event be unforeseeable or beyond the control of Perlman before performance is excused, the district court erred when it supplied those terms as a rule of law. But even under the terms of the Lease, Perlman's performance would not be excused unless he was hindered by the regulatory process in Wyoming or Montana.

■ Perlman argues that because the Wyoming officials refused to commit to permitting a gas well using Perlman's process once they received the hydrology and other expensive studies, and because the regulatory process itself might prevent his meeting the six-month drilling deadline, he was "hindered" by his "inability to obtain governmental permits or approvals necessary or convenient to [his] operations." Perlman's sole basis for this argument is his interpretation of the October 26 meeting between his representative and the officials from the Wyoming Gas and Water

---

**5.** Force majeure is a phrase coined primarily for the convenience of contracting parties wishing to describe the facts that create a contractual impossibility due to an "Act of God." *See* 6 A. Corbin, *Corbin on Contracts*, § 1324 (1962). As Corbin points out, this term is outmoded and serves no useful purpose as a test of responsibility, and the question of the promisor's discharge would be better approached by looking to (1) the terms of the contract, (2) the custom of businessmen in like cases, and (3) prevailing opinion of public welfare as evidenced by the judicial decisions. *Id.* "Force majeure" is therefore, not a fixed rule of law that regulates the content of all force majeure clauses, but instead is a term that describes a particular type

of event, i.e., an "Act of God" which may excuse performance under the contract. That a party labels a condition or event a "force majeure" in a contract does not make that event a force majeure in the traditional sense of the term. Therefore, courts should not be diverted by this "red herring." Instead, they should look to the language that the parties specifically bargained for in the contract to determine the parties' intent concerning whether the event complained of excuses performance. *See, e.g., PPG Industries v. Shell Oil Company*, 919 F.2d 17, at 18 (5th Cir.1990).

**6.** *See supra* note 5.

Commissions. Perlman's interpretation is that the Wyoming officials would refuse to permit any well that drew as much water as could a well using his process. But, as the district court found, the state officials never refused to permit Perlman's operations; they merely required advance studies of the use, quantity, drainage and quality of the water Perlman's process would affect. This requirement was apparently standard, or at least not unusual, for anyone likely to use substantial amounts of water in Wyoming. Furthermore, the amounts of water that would be produced on the Pioneer/Kendrick land using the Perlman process was not a certainty; neither was it known whether the wells might not show beneficial use under the Wyoming water regulations. And, significantly in this case, Perlman's obligation was not limited to use of his patented process.

From the evidence it is clear that no actual hindrance resulted from the regulations or the regulators in Wyoming because Perlman made no effort whatsoever to obtain the appropriate permits or to begin drilling the wells. Consequently, Perlman's self-serving conclusion that a force majeure condition existed was at best merely speculation as to what might have happened had he attempted to drill the wells as planned.

Perlman's reliance on supposition and speculation derived from his interpretation of the October 26 meeting is inadequate to support his argument that he was hindered by the regulatory process in Wyoming.[7] *See, e.g., Oosten v. Hay Haulers Dairy Employees & Helpers Union,* 45 Cal.2d 784, 789, 291 P.2d 17, 21–22 (1955), *cert. denied,* 351 U.S. 937, 76 S.Ct. 833, 100 L.Ed. 1464 (1956) (rejecting the defense of impossibility of performance where premised only on assumption of what might have happened). We require more than the mere possibility or unsupported conclusion of the existence of hindrance by government regulations to relieve Perlman of his obligations under the contract—an actual, material hindrance must occur before performance is excused.

■ Furthermore, under the terms of the contract Perlman had a duty to make a reasonable effort to remove the force majeure condition should one occur. Perlman could have accomplished this either by beginning the permitting process or by using an alternative method of drilling for coal seam gas that would not produce as much water as his process and thus would not be subject to such strict regulation. That Perlman failed even to attempt to remove or overcome the purported force majeure defeats his claim under the contract. *See Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.,* 782 F.2d 314, 319 (2d Cir.1985); *see also Edington,* 213 Mont. at 120, 690 P.2d at 974 ("the force majeure clause is not an escape way for those interruptions of production that could be prevented by the exercise of prudence, diligence, care, and the use of those appliances that the situation or party renders it reasonable that he should employ"). We therefore uphold the district court's conclusion that Perlman's obligation under the Lease and Surface Agreement was not excused by a force majeure, albeit for reasons other than those expressed by the district court.

The Lease's force majeure provision also included a fifteen day notice requirement. We need not address the adequacy of Perlman's notice, however, because we find that no event of force majeure in fact took place within the clear meaning of the contract.

*Section 8 as a penalty*

■ To establish the enforceability of liquidated damages under Wyoming law, the claimant must prove that (a) the amount fixed is a reasonable forecast of just compensation, (b) the harm caused by the breach would be difficult to estimate, and (c) the intent of the parties to provide

7. It is impossible for us to determine whether the permitting process in Montana is the same as that in Wyoming. The only information available to us is Perlman's unsupported statement that the regulations in Montana are stricter that those in Wyoming. Therefore, we conclude that Perlman's performance was not excused in Montana for the same reasons that it was not excused in Wyoming.

for liquidated damages and not a penalty is reasonably clear. *Walker v. Graham,* 706 P.2d 278, 281 (Wyo.1985). Perlman argues that Pioneer failed to prove that the $1.5 million was an accurate estimate of Pioneer's damages, and that in fact there is no evidence from which to infer that the amount bears a reasonable relationship to the amount of Pioneer's actual damages.

Perlman's penalty argument fails for at least three reasons. First, under Wyoming law, the measure of damages for a breach of contract is the amount that will compensate the injured party for the loss that full performance of the contract would have prevented. *Zitterkopf v. Roussalis,* 546 P.2d 436, 438 (Wyo.1976). Pioneer bargained for $1.5 million worth of drilling and exploration in exchange for charging Perlman a dramatically low rent. Thus, under Wyoming law the $1.5 million represents Pioneer's actual loss and bargained for damages.

Second, Section 8 of the Lease is enforceable as an alternative means of performance. Under the Lease, Perlman had the option to spend the $1.5 million on drilling and exploration or to pay that amount directly to Pioneer less only sums actually expended. Such an alternative obligation is enforceable. *See Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.,* 813 F.2d 77, 80 n. 4 (5th Cir.1987).

Third, any other measure of actual damages in this case would be difficult if not impossible to ascertain because it would involve speculative efforts to measure royalties lost by Pioneer. *See* 5 Corbin, *supra,* § 1064 (1964). The evidence adequately supports the district court's conclusion that Section 8 of the Lease is not a penalty provision, but a liquidated damages clause.

*Attorney's fees*

Perlman correctly states that Wyoming does not permit a prevailing party to obtain attorney's fees in the absence of statutory authority or an express contractual provi-

sion for an award of such fees. *See United States* ex rel. *Farmers Home Admin. v. Redland,* 695 P.2d 1031, 1039 (Wyo.1985). Therefore, the only other authority the district court might have had to award attorney fees to Pioneer and Kendrick would be as sanctions for filing frivolous claims in a lawsuit under Fed.R.Civ.P. 11 or Wyo.Stat. Ann. § 1-14-128.

■ In the instant case, the district court did not make a specific finding that Perlman's claims were frivolous thereby requiring the imposition of sanctions in the form of attorney's fees.[8] This court however may infer that a district court made such a finding consistent with its general holdings as long as the inferred finding is supported by the evidence. *Goode v. Herman Miller, Inc.,* 811 F.2d 866, 871 (5th Cir.1987). After reviewing the record, the award of $75,000 in attorney's fees in this case as a sanction based on the frivolity of the claims is not supported by the evidence. Consequently, the district court abused its discretion in awarding attorney's fees in this case. That Perlman failed on his claims is not enough to require the imposition of Rule 11 sanctions for frivolous pleading because it is clear from reviewing the evidence that he made good faith arguments based on existing law. *See Thomas v. Capital Services, Inc.,* 836 F.2d 866, 874 (5th Cir.1988). Neither is his failure to prevail sufficient to justify an award of attorney's fees under the Wyoming statute.

We therefore reverse the district court's award of $75,000 attorney's fees to Pioneer and Kendrick. For the same reasons, Pioneer and Kendrick are not entitled to an award of attorney's fees for this appeal. The award of attorney's fees under Mont. Code Ann. § 82-1-202, however, is affirmed as a statutory attorney's fee as stipulated to by both parties.

For the foregoing reasons, the judgement of the district court is AFFIRMED in

---

**8.** The parties appear to have stipulated that *if* attorney's fees were awarded, $75,000 would accurately reflect the amount for services rendered in this suit. This stipulation however is not an acquiescence by Perlman that he is liable to Pioneer and Kendrick for attorney's fees, but was an effort to provide the court with evidence of fees should an award be proper.

part and REVERSED in part. Costs of this appeal to be borne by Perlman.