Affirmed in Part, and Reversed and Remanded in Part,
and Opinion filed August 6, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00787-CV

____________

 

VIRGINIA POWER ENERGY MARKETING, INC. and DOMINION
RESOURCES, INC., Appellants

 

v.

 

APACHE CORPORATION, Appellee

 

 



 

On Appeal from the
157th District Court

Harris County,
Texas

Trial Court Cause
No. 2005-76899

 



 

O P I N I
O N








This business dispute involves the application and effect of force
majeure provisions in a natural-gas supply contract between the seller,
Apache Corporation, and Virginia Power Energy Marketing, Inc. (AVPEM@), the purchaser.  The parties agreed
that Apache was to deliver natural gas to VPEM at two specific locations in
September and October of 2005.  However, during that time period, Hurricanes
Katrina and Rita struck the Gulf Coast, damaging gas-production platforms and
portions of the natural-gas pipelines.  After Apache failed to deliver the
agreed-upon quantity of natural gas at either location, a lawsuit ensued.  The
trial court ruled, by summary judgment, that Apache=s performance was excused under the force
majeure provisions of the parties= agreement.

Appellants, which consist of VPEM and its parent company,
Dominion Resources, have appealed the summary judgment and raise two
arguments.  First, they contend that, although the hurricanes prevented Apache
from delivering gas to one of the two agreed-upon locations, a Areasonable efforts@ clause in the contract required
Apache to make alternate delivery arrangements.  We affirm that portion of the
summary judgment.  Second, as to the other delivery location, which was
undamaged, appellants claim that Apache had an available gas supply to satisfy
VPEM=s contract needs.  We conclude that a
fact issue exists; therefore, we reverse that portion of the summary judgment,
and remand the dispute to the trial court.

Background

In 2003, Apache and VPEM reached agreement on the basic terms
that would govern a series of natural-gas sales from Apache, a producer, to
VPEM, an energy marketer.  Those general terms are contained in a ABase Contract,@ a form contract that was originally
prepared by the North American Energy Standards Board (ANAESB@) but whose terms can be altered
according to the contracting parties= particular needs.  The Base Contract
contains only the basic provisions that apply to any subsequent natural-gas
sales between the parties, and does not  recite details for any specific transaction. 
Instead, the details of each subsequent sale were to be memorialized in written
ATransaction Confirmations@ (the AConfirmations@).  








Thus, the parties= entire agreement is governed by both
the general Base Contract and the more specific Confirmation that would include
the sales terms as to each individual transaction.[1] 
Generally, the parties agreed that Apache would bear the sole responsibility
for transporting the contract amount of natural gas, according to each
Confirmation, to a designated ADelivery Point@ where it would be received by VPEM.

In August 2005, the parties executed three Confirmations
reflecting Apache=s commitment to sell and deliver, and VPEM=s obligation to pay for, natural gas
during September and October 2005.  The relevant terms of these commitments
were as follows:

(1)       In September 2005, Apache was
to deliver 300,000 MMBtu[2] of natural
gas to VPEM along the Tennessee Gas Pipeline to a Delivery Point identified as
the Zone L Leg 500 Pooling Area (ATennessee
L-500@);

(2)       In October 2005, Apache would
deliver an additional 310,000 MMBtu to VPEM at the same Tennessee L-500
Delivery Point; and

(3)       In October 2005, Apache would
also deliver 310,000 MMBtu to VPEM at Station 65, a Delivery Point along the
Transcontinental Pipeline (ATransco-65@).

 

All three commitments were designated as Afirm@ transactions which, according to the
Base Contract, meant that either party could interrupt performance without
liability Aonly to the extent that such performance is prevented for reasons of Force
Majeure.@[3]  Relevant to this case, the Base
Contract specifically mentioned Ahurricanes@ as a possible force majeure
event.








On August 27, 2005, the approach of Hurricane Katrina to the
Gulf Coast prompted Apache to evacuate numerous offshore platforms and onshore
production facilities.  In the next few days, Apache invoked the force
majeure provisions in the Base Contract and notified VPEM that the
September delivery to Tennessee L-500 would be curtailed.  As it turned out,
the hurricane caused significant damage to portions of the Tennessee Gas
Pipeline that precluded the delivery of gas to the L-500 pooling area, the
agreed destination point for VPEM=s September gas.  VPEM asked Apache
to deliver to an alternate location, but Apache declined.  Thus, VPEM received
only 15,588 MMBtu of the contract quantity of 300,000 MMBtu that was to be
delivered to Tennessee L-500.

The following month, Apache once again evacuated its offshore
platforms in preparation for Hurricane Rita.  Again invoking the Base Contract=s force majeure provisions,
Apache notified VPEM that its October deliveries to both Delivery Points,
Tennessee L-500 and Transco-65, would be suspended or curtailed.  Accordingly,
VPEM received 149,781 MMBtu at Transco-65, but only 38,727 MMBtu at Tennessee
L-500, which remained damaged after the second hurricane.

To cover the shortfall between the contracted-for amounts and
that actually delivered by Apache, VPEM purchased additional gas on the
Intercontinental Exchange Aspot market,@[4] at $2.25 million more than it would
have paid under its contract with Apache.  However, after completing the
anonymous spot-market purchases made necessary following Apache=s force majeure declaration,
VPEM discovered that the seller in several of those spot-market transactions
was, in fact, Apache.








Concluding that Apache had improperly invoked force
majeure to sell natural gas on the spot market at higher prices, VPEM
offset $2.25 million from its other payments to Apache.  Apache demanded
payment of the offset amount from Dominion Resources, VPEM=s parent company that had guaranteed
prompt and complete payment of VPEM=s Adue but unpaid obligations.@

After Dominion failed to pay the demanded amount, Apache sued
VPEM and Dominion for breach of contract.  VPEM counterclaimed, alleging that
Apache breached the Base Contract by improperly invoking force majeure
and refusing to deliver the contract amount of natural gas.  Apache moved for
partial summary judgment on its contract claims against VPEM and Dominion,
arguing that its own performance was excused under the Base Contract=s force majeure provisions but
that appellants breached the contract by paying less than the full amounts due
to Apache.  The trial court granted Apache=s motion for partial summary
judgment, which became final after the parties stipulated to all remaining
issues.

Here, appellants contend Apache was not entitled to summary
judgment, for two reasons.  First, they contend that a Areasonable efforts@ provision in the Base Contract
obligated Apache to provide the Tennessee L-500 gas at a different delivery
location.  Second, they argue that Apache failed to conclusively establish that
the hurricanes prevented performance at the Transco-65 location.[5]

 

 








                                                                    Analysis

The scope and effect of a Aforce majeure@ clause depends on the specific
contract language, and not on any traditional definition of the term.  See
Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc., 157 S.W.3d 462, 466 (Tex.
App.CHouston [14th Dist.] 2004, no pet.); 
Perlman v. Pioneer Ltd. P=ship, 918 F.2d 1244, 1248 n.5 (5th Cir.
1990).  Thus, in this contract dispute that ended by summary judgment, we begin
with a brief discussion of the principles that govern our review of the summary
judgment and interpretation of the contract.

A.        Standard
of Review

To be entitled to summary judgment, Apache, the plaintiff,
was required to conclusively establish all of the elements of its cause of
action as a matter of law.  See Brown v. Blum, 9 S.W.3d 840, 845 (Tex.
App.CHouston [14th Dist.] 1999, pet. dism=d w.o.j.).   We must examine the
entire record in the light most favorable to the non-movant, indulging
reasonable inferences and resolving doubts against the moving party.  City
of Keller v. Wilson, 168 S.W.3d 802, 824 (Tex. 2005). If the motion and
summary-judgment evidence establish the movant=s right to judgment as a matter of
law, the burden shifts to the non-movant to raise a genuine, material fact
issue to defeat summary judgment.  See M.D. Anderson Hosp. & Tumor Inst.
v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000).  Evidence will raise a genuine
fact issue if, after considering it, reasonable and fair-minded jurors could
differ in their conclusions.  See Goodyear Tire & Rubber Co. v. Mayes,
236 S.W.3d 754, 755 (Tex. 2007).  If, as here, the trial court specifically
states the basis on which it granted the motion for summary judgment, we must
consider those grounds.  See Zurich, 157 S.W.3d at 464B65.  In addition, in the interest of
judicial economy, we may also consider other grounds that the trial court did
not expressly address.  See id.








The party seeking to excuse its performance under a
contractual force majeure clause, here, Apache, bears the burden of
proof to establish that defense.  See Moore v. Jet Stream Invs., Ltd.,
261 S.W.3d 412, 420 (Tex. App.CTexarkana 2008, pet. denied).  As we interpret the parties= contract, including the force
majeure provisions, our primary concern is to determine the parties= intent.  See Zurich, 157
S.W.3d at 465.  We must examine the contract as a whole to harmonize and
effectuate all of its provisions so that none are rendered meaningless.  Id. 
We look at how a reasonable person would have used and understood the language,
by considering the circumstances surrounding the contract negotiations and
purposes the parties intended to accomplish by entering into the contract.  Cook
Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 132 (Tex. App.CHouston [14th Dist.] 2000, pet. dism=d).

B.        The
Contract=s Force Majeure Provisions

The relevant force majeure portions of the Base
Contract provide as follows:

11.1.   [N]either party shall be liable to the other
for failure to perform a Firm obligation, to the extent such failure was caused
by Force Majeure.  The term AForce
Majeure@ as employed herein means any cause not reasonably
within the control of the party claiming suspension, as further defined in
Section 11.2.

11.2.   Force Majeure shall include, but not be
limited to . . . physical events such as acts of God, landslides, lightning,
earthquakes, fires, storms or storm warnings, such as hurricanes, which result
in evacuation of the affected area, floods, washouts, explosions, breakage or
accident or necessity of repairs to machinery or equipment or lines of pipe . .
. .  Seller and Buyer shall make reasonable efforts to avoid the adverse
impacts of a Force Majeure and to resolve the event or occurrence once
it has occurred in order to resume performance.

11.3.   Neither party shall be entitled to the benefit
of the provisions of Force Majeure to the extent performance is affected
by . . . the loss or failure of Seller=s
gas supply or depletion of reserves, except, in either case, as provided in
Section 11.2.[6]

 








The Base Contract further defines the word AFirm,@ as used in section 11.1, to mean Athat either party may interrupt its
performance without liability only to the extent that such performance is
prevented for reasons of Force Majeure[.]@[7]  However, the Base Contract does not
define the terms Areasonable efforts,@ from section 11.2, or Agas supply,@ as found in section 11.3.

C.        Delivery
to Alternate Locations

Regarding the Tennessee L-500 commitments, VPEM concedes that
the hurricanes caused damage to the Tennessee Gas Pipeline that prevented
Apache from making delivery at the agreed-upon Delivery Point.  Nevertheless,
VPEM contends that, under the Areasonable efforts@ clause in section 11.2 of the Base
Contract, Apache was required to perform at an alternate Delivery Point along
the pipeline.  We disagree, because such an interpretation conflicts with the
parties= express agreement and would
frustrate their intent to excuse non-performance caused by a force majeure
event.

That is, the parties expressly agreed that Apache was to
deliver 610,000 MMBtu of natural gas to a specific Delivery Point: the
Tennessee L-500 pooling area.  The parties also agreed, through the Base
Contract, to relieve Apache from performing if a force majeure event
were to prevent delivery.  However, both of these contract provisions would be
rendered meaningless under VPEM=s interpretation of the Areasonable efforts@ clause, which would force Apache to
deliver gas, notwithstanding an acknowledged force majeure event, to a
location other than that to which the parties expressly agreed.  See Tex.
Workers= Comp. Ins. Facility v. State Bd. of Ins., 894 S.W.2d 49, 54 (Tex. App.CAustin 1995, no writ) (A[O]ne party cannot unilaterally
modify the terms of the original contract.@).








We must presume that the parties intended each contract
provision to have effect.  See Phoenix Holdings, Ltd. v. Circle C Land Corp.,
987 S.W.2d 933, 937 (Tex. App.CAustin 1999, pet. denied) (citing Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983)).  Therefore, we may not construe one clause in a
manner that renders other provisions meaningless.  See Shell Oil Co. v. Khan,
138 S.W.3d 288, 292 (Tex. 2004).  Nor may we rewrite the parties= contract under the guise of
interpretation.  See Gen. Am. Indem. Co. v. Pepper, 339 S.W.2d 660, 661
(Tex. 1960); Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C., 207
S.W.3d 801, 815 (Tex. App.CHouston [14th Dist.] 2006, pet. denied).  Thus, we may not
construe the Areasonable efforts@ clause as requiring Apache to agree to VPEM=s demands to alter the express terms
of their contract.  See Pepper, 339 S.W.2d at 661; see also Werline
v. E. Tex. Salt Water Disposal Co., 209 S.W.3d 888, 901 (Tex. App.CTexarkana 2006, pet. granted)
(declining to interpret Areasonable policies@ provision to vary explicit language
in contract).

Arguing that Areasonable efforts@ includes alternate delivery, VPEM
notes that, during the same time frame, Apache agreed to different delivery
arrangements with another purchaser, the Municipal Gas Authority of Georgia (AMGAG@).  However, that argument is not
persuasive because Apache=s contract with MGAG is different in several respects.[8] 
Significantly, it contains a provision expressly obligating both parties
to agree to alternate delivery locations upon reasonable request:  ADelivery Points may, subject to the
consent of the other party, be redesignated from time-to-time, in writing, by
either Seller or Purchaser, provided that such consent shall not be
unreasonably withheld.@  By contrast, Apache=s contract with VPEM does not include
a similar provision.  Therefore, we cannot conclude that the parties intended
that the Areasonable efforts@ clause would trump their express agreement concerning
delivery locations.








Alternatively, VPEM contends that Apache was required to make
alternate delivery under Uniform Commercial Code section 2-614, which provides:
AWhere without fault of either party
the agreed berthing, loading, or unloading facilities fail or an agreed type of
carrier becomes unavailable or the agreed manner of delivery otherwise becomes
commercially impracticable but a commercially reasonable substitute is
available, such substitute performance must be tendered and accepted.@  Tex. Bus. & Comm. Code Ann. ' 2.614(a) (Vernon 2009).[9] 


However, like several other provisions of Article 2 of the
UCC, section 2.614 is a Agap-filler@ provision that applies only in the absence of the parties= specific agreement.  See id. ' 1.302(a) (Vernon 2009) (A[T]he effect of provisions of this
title may be varied by agreement.@); Lenape Res. Corp. v. Tenn. Gas
Pipeline Co., 925 S.W.2d 565, 570 (Tex. 1996); Milton M. Cooke Co. v.
First Bank & Trust, ___ S.W.3d ___, No. 01-07-01000-CV, 2009 WL 943848,
at *5 (Tex. App.CHouston [1st Dist.] Apr. 9, 2009, no pet.).  In this case,
the parties reached a specific agreement under which Apache would be relieved
from making delivery if a force majeure event, like a hurricane,
prevented performance because of Abreakage or accident or necessity of
repairs to . . . lines of pipe.@  Therefore, section 2.614 cannot vary the terms of the
parties= express agreement.  See Lenape
Res. Corp., 925 S.W.2d at 570.

Here, two hurricanes combined to cause enough damage to the
Tennessee Gas Pipeline that Apache could not perform at the agreed-upon L-500
Delivery Point.  Therefore, that aspect of Apache=s contract performance was excused under
force majeure.  Accordingly, we hold that the trial court properly
granted summary judgment on that basis.

 

 








D.        Loss
or Failure of Apache=s AGas Supply@ Preventing Performance

Although delivery was impossible at Tennessee L-500 because
of damage to that pipeline, deliveries did occur at the other Delivery Point,
Transco-65.  Nevertheless, Apache delivered only half of its October commitment
to VPEM at that location.  To explain the shortfall, Apache again invoked force
majeure, claiming that the hurricanes caused a Aloss or failure of [its] gas supply,@ as contemplated by sections 11.2 and
11.3.  However, under the Base Contract, a Aloss or failure of Seller=s gas supply@ does not constitute force majeure
unless such loss was caused by a qualifying event that prevented the seller
from performing.

VPEM concedes that the hurricanes were a force majeure
event, under section 11.2.   Thus, the outcome of this issue turns upon the
question of whether Apache conclusively established, through summary judgment,
that it suffered a loss or failure of its Agas supply@ that prevented delivery of the full
contract amount of gas to Transco-65.  Central to this inquiry is the meaning
of the contract term Agas supply,@ which is not defined in either the Base Contract or
subsequent Confirmations.

1.         The
Parties= Proposed Definitions of AGas Supply@

Apache=s proposed definition of Agas supply@ reflects its apparent plan, on some
internal level, to fill VPEM=s commitment needs at Transco-65 from a few specific oil and
gas platforms located in south and southeastern Louisiana.  In line with this
intent, Apache advances a narrow definition of Agas supply@ that includes only those specific
platforms, which Apache characterizes as its Aequity production@ that was native to, or tied into,
Transco-65.  By contrast, VPEM urges a broader reading of the term Agas supply@ that would encompass Apache=s uncommitted gas from Athe same geographic region@ that could have been used to meet
its commitment to VPEM.








In determining the parties= intent, we must assign terms their
plain, ordinary, and generally accepted meaning unless the contract indicates
that the parties used them in a technical or different sense.  See Zurich,
157 S.W.3d at 465; see also Jim Walter Homes, Inc. v. Schuenemann, 668
S.W.2d 324, 330 (Tex. 1984) (requiring courts to construe a contract in a
manner that gives effect to the parties= intentions as revealed by the
language used in the contract).  Even so, however, we may consider extrinsic
evidence, such as expert testimony or reference material, to determine whether
a contract term enjoys a commonly understood meaning in the industry.  See
XCO Prod. Co. v. Jamison, 194 S.W.3d 622, 627B28 (Tex. App.CHouston [14th Dist.] 2006, pet.
denied); Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.,
56 S.W.3d 313, 320 (Tex. App.CHouston [1st Dist.] 2001, pet. denied) (citing Nat=l Union Fire Ins. Co. v. CBI Indus.,
Inc., 907 S.W.2d
517, 521 n.6 (Tex. 1995)).

Apache argues that, in the oil and gas industry, it is common
practice for a supplier to internally decide on a specific supply source that
will be used to satisfy a particular customer=s commitments.  Apache therefore
concludes that, within the industry, the term Agas supply@ is commonly understood to refer only
to those sources internally designated by the seller.  Apache presents
no expert testimony, and points to no reference materials, buttressing that
claim.  By contrast, VPEM contends that, if a seller wishes to limit its Asupply@ to a specific source, it must
expressly state that intent in the contract.  In support, VPEM offered the
expert testimony of James H. Buccigross, who opined:

Apache=s source of
supply is not stated in the Base Contract or the Transaction Confirmations. 
Other producers and sellers of natural gas often choose to specify the
production point or wellhead on their contracts or Transaction Confirmations. 
Apache did not.  If Apache and VPEM wanted to Apath@ the gas from specific wellhead(s) to delivery points
then that information should have been in the contract, or at least the
Transaction Confirmations, and it was not. 

 








Thus, on the record presented, we cannot conclude that Apache=s proposed definition of Agas supply@ is so common and universal in the
industry that the parties can be said to have contracted with that
understanding in mind.  See Energen Res. MAQ, Inc. v. Dalbosco, 23
S.W.3d 551, 556 (Tex. App.CHouston [1st Dist.] 2000, pet. denied) (citing Barreda v.
Milmo Nat=l Bank, 252 S.W. 1038, 1039B40 (Tex. Comm=n App. 1923, judgm=t adopted); State Nat=l Bank of Houston v. Woodfin, 146 S.W.2d 284, 286 (Tex. Civ. App.CGalveston 1940, writ ref=d)).  As the Woodfin Court
noted:

It has been uniformly held in this State
that a custom, in order to constitute an element of contract, must be either
shown to have been known personally to the parties to the contract, or to have
been so general and universal that the parties are charged with knowledge of
its existence to such an extent as to raise a presumption that they dealt with
reference to it.

 

Woodfin, 146
S.W.2d at 286; see also Barreda, 252 S.W. at 1039B40 (AThe general rule in the case of
contract is that the custom and usage must be so general that both are presumed
to be aware of them, or that they have actual knowledge of them, to be charged
with having contracted with reference to such usage and custom.@).  Apache has failed to make that
necessary showing.

Instead, the record indicates, and Apache conceded during
argument, that neither the Base Contract nor Confirmations reveal any intent by
Apache to so limit its Agas supply@ to its internally designated Aequity gas.@  Moreover, in post-submission
briefs, both parties agreed that, pursuant to section 11.6 of the Base
Contract, the parties could have inserted a specific supply source in
the ASpecial Terms and Conditions@ section of the Confirmations. 
However, the Confirmations reflect no such agreement, nor can we imply one in
light of the Base Contract=s merger clause, which states:








14.4    This Contract[10]
sets forth all understandings between the parties respecting each transaction
subject hereto, and any prior contracts, understandings and representations,
whether oral or written, relating to such transactions are merged into and
superseded by this Contract and any effective transaction(s).  This Contract
may be amended only by a writing executed by both parties.

 

Thus, because Apache has not demonstrated that its suggested definition
of Agas supply@ is commonly understood in the
industry or was personally known to VPEM, we will define the term according to
its plain, ordinary, and generally accepted meaning.  See Zurich, 157
S.W.3d at 465.

2.         Resolution
under the Plain and Ordinary Meaning of AGas Supply@

The first part of this definition is straightforward.  The
parties do not dispute the meaning of Agas,@ which is defined in the Base
Contract as Aany mixture of hydrocarbons and noncombustible gases in a gaseous state
consisting primarily of methane.@  

However, the word Asupply@ is not defined.  Although the
precise definition of Asupply@ differs slightly according to the dictionary consulted, the
plain and ordinary meaning of the word denotes a quantity or amount that is Aavailable for use.@  See Webster=s Third New
Int=l Dictionary 2297 (1993) (Athe quantity or amount (as of a
commodity) needed or available,@ or Aa quantity available for use@); Black=s Law Dictionary 1439 (6th ed. 1990) (Aavailable aggregate of things needed
or demanded@).   That definition comports with the generally accepted understanding
of the word Asupply.@  Thus, the plain and ordinary meaning of Agas supply,@ as used in the Base Contract, refers
to the amount or quantity of gas that was available to satisfy VPEM=s contractual demands.








Under that definition, Apache=s summary-judgment evidence fails to
conclusively establish that the hurricanes caused a loss or failure of Agas supply@ that prevented a full delivery to
VPEM at Transco-65.  Its evidence consists of an affidavit and deposition from
one of its gas marketing representatives, Sean Maki.  However, Maki=s testimony is limited to the effect
of the hurricanes on the specific platforms that Apache had internally
earmarked to deliver to VPEM, and does not  speak to any other sources of
gas that might have been Aavailable@ to deliver to Transco-65.

By contrast, VPEM offered the following expert testimony from
Buccigross:

It is now clear after the fact that Apache had
available uncommitted gas to fulfill VPEM=s
contract in the same geographical area, but instead offered that gas to new
contract customers in order to obtain the benefit of the higher prices.

. . .  It is my opinion that Apache clearly had supply
reasonably available to fulfill VPEM=s
firm delivery requirements at locations in the same geographic region . . . .

. . .  Importantly, there was not a total loss
of Apache=s gas supply due to the force majeure situation, only
Apache=s claim that VPEM=s
specific gas supply was lost, while other supply (including the gas Apache sold
at higher spot prices) apparently remained intact.[11]

 

The record also reveals that Apache was able to deliver spot-market gas
to VPEM at two other points along the Transcontinental Pipeline, including two
delivery pools that appear to serve as geographic bookends to Transco-65.[12] 
However, Apache=s summary-judgment evidence does not address the availability
of any of these supply sources to meet VPEM=s contract requirements.[13]








Therefore, the evidence raises a fact issue as to whether the
hurricanes prevented Apache from delivering the full amount of available gas to
VPEM at Transco-65.  Accordingly, Apache did not conclusively establish the
application of force majeure at that location, and was not entitled to
summary judgment on that basis.  See Moore, 261 S.W.3d at 420.

3.         Resolution
under Apache=s Suggested Definition of AGas Supply@

Even were we to embrace Apache=s proposed definition of Agas supply,@ the summary-judgment evidence still
raises a fact issue as to whether a loss or failure of its Anative gas@ actually precluded Apache from
performing.  In fact, the record indicates that, notwithstanding the
hurricanes, Apache still delivered sufficient gas to Transco-65 to meet all of
its stated commitments, including VPEM=s, but that one purchaserCMorgan StanleyC  received a disproportionate share
apparently in excess of its contract allotment.  Therefore, even under Apache=s reading of the contract, we would
still have to reverse and remand on the record presented.

The summary-judgment evidence includes a chart that reflects
all of Apache=s October 2005 delivery commitments to Transco-65.  According to that
document, Apache was contractually obligated to deliver, to that location, a
total of 1,550,000 MMBtu.  That amount was to be evenly distributed among five
customers with each receiving 310,000 MMBtu.  In fact, during October, Apache
actually delivered more gasC1,623,149 MMBtuCthan was necessary to meet all of its
apparent contract commitments at that location.

However, one of the five customers, Morgan Stanley, received
1,024,038 MMBtu, an amount more than three times the quantity listed as its AContract Vol[ume].@  As a result, the remaining 559,111
MMBtu was left to be split equally among the four remaining customers, each of
whom received roughly half of the amount due.  Thus, this document raises an
additional fact question as to whether the hurricanes prevented Apache from
supplying enough gas, even under its limited definition of Agas supply,@ to satisfy its Transco-65
commitments, including VPEM=s.








In an effort to explain this discrepancy, Apache notes that,
on the chart, Morgan Stanley is identified as having a Arank@ of A1,@ while VPEM=s Arank@ is only a A2.@  However, as Apache acknowledged
during arguments, the summary-judgment record does not explain the significance
of these rankings.[14]  Instead,
Apache directs us to Tejas Power Corp. v. Amerada Hess Corp., in which
this Court discussed the concept of ranking gas purchasers:

As is common practice in the gas sales
industry, Texas Eastern Transmission Company (ATETCO@), the pipeline system used, required Amerada to rank
its customers in the event deliveries needed to be curtailed.  TETCO used the
rankings as a method of discerning which customers to ship to if the total
amount of gas expected is not available.

 

No. 14-98-00346-CV, 1999 WL 605550, at *1 n.1 (Tex. App.CHouston [14th Dist.] Aug. 12, 1999,
no pet.) (not designated for publication) (emphasis added).  However, Tejas=s description of ranking contemplates
situations, unlike here, in which a supplier delivers less than the amount of
gas expected.  See id. In this case, the record suggests that Apache
delivered more than the Atotal amount of gas expected@ at Transco-65.  Therefore, Tejas
is not instructive here.








Thus, even under Apache=s narrow reading of the contract, the
evidence still raises a fact issue precluding summary judgment as to Apache=s performance at Transco-65.  We
sustain appellants= first issue to that extent.  Because of our resolution of
that argument, we need not reach appellants= alternative argument that the Base
Contract=s reasonable-efforts clause,
discussed above, would also have required Apache to deliver uncommitted,
available gas from the same geographic region.

                                                                CONCLUSION

We affirm the summary judgment to the extent that it excused
Apache=s non-performance at the Tennessee
L-500 Delivery Point.  However, a fact issue exists as to whether Apache
suffered a loss or failure of gas supply that prevented it from fully performing
at Transco-65.  Therefore, we reverse that portion of the summary judgment, and
we remand that dispute for further proceedings not inconsistent with this
opinion.

 

 

 

/s/      Kent
C. Sullivan

Justice

 

 

 

 

Panel
consists of Justices Yates, Guzman, and Sullivan.









           [1] 
The parties agree that each Confirmation represents a separate contract
transaction, although all such sales are governed by the same general terms
from the Basic Contract.





           [2] 
According to the Base Contract, one AMMBtu@ represents one million British thermal units, and
equates to one Adekatherm@ of
natural gas.





           [3] 
(Italics added).  Generally speaking, the term Aforce majeure@ refers to an event, such as an AAct of God,@
beyond the parties= reasonable control that intervenes to create a
contractual impossibility and thereby excuse contract performance.  See
Perlman v. Pioneer Ltd. P=ship, 918 F.2d 1244, 1248 n.5
(5th Cir. 1990); Black=s
Law Dictionary 645 (6th ed. 1990).





           [4] 
In its brief, VPEM describes the Intercontinental Exchange as Aan electronic exchange that matches sellers having
available gas with buyers in need of supply.@ 
Generally, a Aspot market@
refers to a commodity market in which goods can be sold for cash for immediate
delivery.  See Black=s
Law Dictionary 1402 (6th ed.1990).





           [5] 
Appellants also claim that Apache violated the Base Contract by engaging in
profiteering, that is, invoking force majeure so as to sell gas at a
higher price than the contract price.  They point to a clause which states only
that force majeure does not include a party=s economic hardship, such as its Aability to sell Gas at a higher or more advantageous
price than the Contract Price.@  However,
Apache did not invoke Aeconomic hardship@ to
justify its nonperformance; instead, it contended that the hurricanes rendered
performance impossible which, if true, would be an appropriate reason under the
Base Contract to excuse its nonperformance.  Therefore, to resolve this appeal,
we need not address this argument.





           [6] 
Italics added.





           [7] 
Italics added.





           [8] 
Apache=s Base Contract with VPEM is twelve pages long.  By
contrast, Apache=s entire agreement with MGAG is almost ten times that
size, occupying 117 pages in the appellate record.  Notably, the MGAG agreement
is not based upon, and contains numerous provisions that are absent from, the
NAESB form contract, including a clause expressly providing for alternate
delivery arrangements.





           [9] 
Section 2.614 of the Business and Commerce Code is identical to UCC section
2-614.  See Tex. Bus. & Comm. Code Ann. ' 2.614 historical note (Vernon 2009) [Act of May 25,
1967, 60th Leg., R.S., ch. 785, ' 1
sec. 2.614, 1967 Tex. Gen. Laws 2343, 2393]. 





           [10] 
The Base Contract defines the term AContract,@ as used in section 14.4, to include both the Base
Contract and any subsequent Transaction Confirmations.





           [11] 
Emphasis in original.





           [12] 
That is, the Confirmations also refer to the Transco-65 Station as the ATransco Z3 Pool,@
which apparently lies along the same pipeline, and somewhere in between, the
Transco AZ2@ and AZ4@ pooling areas
where VPEM=s spot-market purchases were ultimately delivered.





           [13] 
The trial court ruled that Apache was not legally obligated to purchase gas on
the spot market to meet its contractual commitment to VPEM, citing this court=s opinion in Tejas Power Corp. v. Amerada Hess
Corp.  No. 14-98-00346-CV, 1999 WL 605550, at *3 (Tex. App.CHouston [14th Dist.] Aug. 12, 1999, no pet.) (not
designated for publication).  Appellants do not challenge that portion of the
trial court=s ruling on appeal.





           [14] 
Apache attempted to supplement the summary-judgment record with evidence that
might explain Morgan Stanley=s receipt of
more than its apparent contract commitment.  However, the trial court struck
Apache=s late-filed evidence as untimely.  Therefore, because
the trial court did not consider Apache=s
explanation in ruling on its motion for summary judgment, we cannot consider
it, either.  See Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex.
1996); Neimes v. Ta, 985 S.W.2d 132, 140 (Tex. App.CSan Antonio 1998, pet. dism=d).  We also note that, because Apache=s additional evidence was not timely filed, VPEM did
not have an opportunity to refute Apache=s
explanation of the disparate treatment given to its Transco-65 customers.