Opinion by Justice Perkes
Appellant Kleberg County (Kleberg) and cross-appellant URI, Inc. (URI) dispute various provisions of a settlement agreement regarding URI's uranium mine operations.[1] URI filed suit against Kleberg pursuant to the Declaratory Judgments Act seeking a declaration that URI had complied with the well restoration pre-requisites of the settlement agreement. Kleberg filed an answer and counter-petition alleging four separate theories of breach of contract and requesting declaratory relief. URI responded to Kleberg's counter-petition by raising affirmative defenses. After a bench trial, the trial court found in favor of Kleberg on one of its breach of contract claims-that URI failed to restore a well to its pre-mining water quality-and awarded Kleberg nominal damages and partial specific performance. The trial court declined to award attorney fees.
By four issues, Kleberg argues: (1) the trial court erred by failing to award attorney fees to Kleberg; (2) the trial court erred by ordering specific performance that deviated from the terms of the settlement agreement; (3) URI breached its water treatment obligations; and (4) URI breached its duty to provide written notice and reports.[2]
*603 By two cross-appeal issues, which we address first, URI argues: (1) the trial court erred by finding URI breached its restoration obligations; and (2) the case should be remanded to the trial court to determine attorney's fees. We reverse and remand.
I. BACKGROUND
URI operates the Kingsville Dome (KVD) uranium mine; located approximately eight miles southeast of Kingsville. The KVD site is roughly within a half-mile of several domestic water wells and shares its geological formation with an aquifer. The mine is divided into three productions areas, PAA-1, PAA-2, and PAA-3.
Beginning in 1985, before commencing mining operations, URI drilled wells in PAA-1 to test the underground aquifer water. The water in one of those test wells, I-11, met the then-current standards for irrigation. In 1987, URI retested its wells, including I-11. The 1987 samples showed that the groundwater from well I-11 contained a higher level of uranium, rendering the well unsuitable for irrigation. Also in 1987, URI submitted a permit application for PAA-1 to the Texas Water Commission, the precursor to the Texas Commission on Environmental Quality (TCEQ). With the permit application, URI included the results of the well I-11 samples taken in 1985, but not the samples taken in 1987. TCEQ issued the permit in 1988, and URI mined uranium in PAA-1 from 1988 to 1991, and again from 1996 to 1999. In 2004, URI sought and received authorization from TCEQ to commence mining in PAA-3.
Also in 2004, Kleberg and URI entered into a settlement agreement pertaining to URI's mining activities at KVD, specifically, the restoration of groundwater. URI's post-mining restoration of groundwater is at the heart of this dispute. The agreement states in pertinent part:
1.4 Restore 240,000,000 Gal./Yr.-20,000,000 Gal./month averaged over one year. Beginning on the Effective Date and continuing until groundwater restoration in Production Areas 1, 2, and 3 at URI's Kingsville Dome Mine in Kleberg County, Texas is completed and approved by TCEQ and TDH. URI will conduct its operations at its Kingsville Dome Mine so as to restore the ground water in the mine zone in the said Production Areas at a treatment rate equal to or greater than 240,000,000 gallons per year, all to be recorded and reported as provided for in paragraph 1.5(1).
....
1.5. Record and Report to Kleberg County. Beginning on the Effective Date and continuing until groundwater restoration in all Production Areas 1, 2, 3, and subsequently approved PAA's at URI's Kingsville Dome Mine *604 is completed and approved in writing by TCEQ and TDH, URI will:
(1) make and maintain records of the rates and amounts of pumping of contaminated ground water and the disposal of liquids in any disposal well(s) on at least a weekly basis;
(2) make, as nearly as practicable at the time of the event, and maintain thereafter, records of any spill, excursion or noncompliance with this Agreement or with any permit or license from TCEQ or TDH; and,
(3) beginning on January 15, 2005, and continuing thereafter until restoration of Production Areas 1, 2, 3, and subsequently approved PAA's of the Kingsville Dome Mine has been completed, provide copies of the said records in a quarterly report to the Kleberg County Judge no later than the 10th working day following the end of each calendar quarter, together with an estimate of the time URI estimates it will need to complete groundwater restoration for any Kingsville Dome Mine Production Area which has been mined but at which groundwater has not yet been restored.
....
4. Notices. Any notices or other communications to be given to or served upon any party to this Agreement in connection with this Agreement must be made in writing and may either be given by facsimile, certified mail, or overnight courier service. If not given in person, any notice shall be given to the parties of this Agreement at the following addresses:
....
If to Kleberg County, then to:
County JudgeKleberg CountyP.O. Box 752Kingsville, TX 78354
With a copy to:
Richard W. Lowerre44 East Avenue, Suite 101Austin, TX 78701
....
9. Force Majeure. URI shall not be deemed to have failed to meet any obligation under this agreement if URI's performance or failure to perform or delay in performance has been caused by any Act of God, war, strike, hot, electrical outage, fire, explosion, flood, blockade, governmental action, or other catastrophe (hereafter, "force majeure"). In the event of the occurrence of any event or events which constitute a "force majeure," URI shall notify Kleberg County as soon as practicable of such occurrence or occurrences. This Paragraph shall not apply to the obligations set out above in Paragraphs 1.1, 1.2, and 1.3 of this Agreement.
....
11. Other Provisions.
11.1. Resumption of PAA 3 Mining To Await PAA 1 Restoration Certificate and Data. URI will not resume economic mining in KVD Production Area 3 before it has submitted to the County Judge of Kleberg County both
(1) a sworn statement of a URI officer certifying to the Kleberg County Judge
(i) that URI has completed treatment of 6 pore volumes of water in KVD Production Area 1; and
(ii) that 90% or more of the combined total of TCDQ production area baseline wells in KVD Production Area 1 and any other wells in *605 the production patterns that URI sampled and for which baseline is available before mining begins, whose water was suitable on a well-by-well basis before URI's mining in PAA 1 for use as either drinking water, livestock water, or irrigation water according to the criteria of 1,7(3) and parameters and limits set out in the Water Quality Use Limits Table in Par. 1.7 of this agreement, has been returned to suitability, based on the same parameters and limits on a well-by-well basis, for the same use to which it was suited before such mining; and,
(2) a copy of the analytical data the URI officer relies upon in making the certification under this sub-par 11.1 as to (i) which individual baseline wells are deemed to have produced water suitable for either drinking, stock watering, or irrigation use before URI's mining in PAA 1, and (ii) the use suitability to which post-mining water quality in the relevant Production Area 1 baseline wells has been returned.
The Agreement further included a table titled "Water Quality Use Limits" which showed the permissible levels of various chemicals and elements for different water uses: drinking; livestock; and irrigation.
URI began restoring wells in PAA-1, and, in 2006, submitted a certificate to the Kleberg County Judge showing that the wells in PAA-1 were sufficiently restored to allow commencement of mining in PAA-3. In 2007, the Kleberg County Commissioners, dissatisfied with URI's restoration efforts in PAA-1, adopted a resolution to enforce the requirements of the Agreement "by all legal means available including litigation before any further mining takes place in [PAA-3]."
II. LITIGATION HISTORY
URI filed suit against Kleberg in 2010 seeking declaratory relief. URI pleaded one cause of action under the Declaratory Judgment Act that it complied with the terms of paragraph 11.1 of the settlement agreement; most specifically that it complied with the agreement with respect to restoration of PAA-1. See TEX. CIV. PRAC. & REM. CODE. § 37.003 (West, Westlaw through 2013 R.S.). URI also requested recovery of attorney's fees.
Kleberg filed an answer and counter-petition, alleging that URI breached the Agreement by: (1) failing to provide notices to its attorney, Richard Lowerre[3] ; (2) failing to restore PAA-1 per paragraph 11.1; (3) failing to treat groundwater at required rates; and (4) failing to provide fiscal security for restoration. Kleberg also sought declaratory relief, disgorgement of profits[4] , nominal damages, and attorney's fees pursuant to section 37.009 of the Texas Civil Practice and Remedies Code. See id. § 37.009. Kleberg further sought court declarations for each of the four theories pleaded in its breach of contract cause of action.
In response to Kleberg's counter-petition, URI generally raised several affirmative defenses, including laches, waiver, estoppel, and failure to mitigate, but did not specify to which claims these defenses applied. URI also alleged that its failure to *606 perform restoration at the agreed rate was excused by the force majeure provision of the Agreement.
Following a bench trial, the trial court issued a written judgment that found:
(1) URI did not breach the Settlement Agreement with regard to the delivery of SEC reports, quarterly reports, or force majeure notices to the County Judge;
(2) URI prevailed on the affirmative defenses of laches, waiver, estoppel, and failure to mitigate with regard to Kleberg County's claim of breach of the Settlement Agreement with regard to the delivery of SEC reports, quarterly reports or force majeure notices to the County Judge;
(3) URI prevailed on the affirmative defenses of laches, waiver, estoppel, and failure to mitigate with regard to Kleberg County's claim of breach of the Settlement Agreement with regard to the delivery of SEC reports, quarterly reports or force majeure notices to Richard Lowerre;
(4) URI prevailed on Kleberg County's claim of breach of the Settlement Agreement with regard to the treatment of water from PAA-1, PAA-2 and PAA-3 at the rate of 240 gallons per year;
(5) URI prevailed on the affirmative defenses of force majeure, estoppel, waiver, laches, and failure to allow for notice or mitigation with regard to Kleberg County's claims of breach of the Settlement Agreement with regard to the treatment of water from PAA-1, PAA-2 and PAA-3 at the rate of 240 million gallons per year;
(6) URI prevailed on Kleberg County's claim that URI failed to complete the treatment of 6 pore volumes as required by paragraph 11.1(1)(i) of the Settlement Agreement;
(7) Kleberg County prevailed on its claim of breach of the Settlement Agreement regarding URI commencing mining in PAA-3 prior to restoring well I-11 (I-11A at the time of trial)[5 ] to suitability for agricultural irrigation and the requested specific performance that the well be restored;
(8) Kleberg County prevailed on its claim of breach of the Settlement Agreement based upon the submission of the 1987 sample data for well I-11 which changed/altered the suitability of the water in well I-11;
(9) Kleberg County was not entitled to the specific performance or declaratory relief requested barring URI from mining in PAA-3;
(10) Kleberg County received only nominal damages in the amount of $20.00;
The trial court issued a subsequent separate judgment denying attorney's fees to each party. In its judgment for attorney's fees, the trial court found that Kleberg incurred $502,924.67 in attorney fees, and URI incurred $929,856.32 in attorney fees.[6] The trial court found that both Kleberg and URI sought attorney fees pursuant to the Declaratory Judgment Act (DJA) and that both were prevailing parties within *607 the DJA. The court, however, found that an award of attorney's fees under the DJA was inequitable. Additionally, the trial court noted that Kleberg requested attorney fees on its breach of contract causes of action pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code. See TEX. CIV. PRAC. & REM. CODE. § 38.003. The trial court explained that Kleberg did not prevail on any of its breach of contract claims that would give rise to attorney's fees; rather, URI prevailed by virtue of its waiver, laches, estoppel, and failure to mitigate affirmative defenses.
In support of its ruling on the merits, the trial court issued comprehensive findings of fact and conclusions of law. Regarding URI's treatment obligations, the trial court's findings of fact and conclusions of law state:
9. The Court finds the gravamen of the entire case centered on URI obligations to perform restoration at levels agreed upon by the parties to the Settlement Agreement; and, in return for performance of restoration at the required levels, the County would not continue its objection to the recommencement of mining in PAA3.
10. The Court finds that URI performed restoration in accordance with the terms of the Agreement by treating 240,000,000 gallons of water on an annual basis and for any year that the 240,000,000 gallons was not treated, URI's performance is excused due to notification of force majeure timely served on the County; the Court finds no objection was ever made to the notice of force majeure; further, the Court finds that URI returned in excess of a total of six pore volumes of water to PAA1 before recommencing mining in PAA3. The Court finds that URI did not restore Well I-11 to its prior use for irrigation prior to recommencing mining in PAA3; and the Court finds that the remedy of specific performance is an impossibility because Well I-11 no longer exists and has sanded in, failing to produce water. The Court finds URI drilled a well to replace Well I-11 (Well I-11A) adjacent to the area of Well M1 and the Court finds that URI has continued to restore this replacement well. The Court finds it is equitable that URI continue to restore the water in Well I-11A, and, the Court further finds it is equitable that URI may recommence mining in PAA3 during the restoration of Well I-11A.
Regarding URI's breach of the settlement agreement, the trial court found:
4. The Court finds that URI unintentionally breached the agreement when it recommenced mining in PAA3 without first restoring Well I-11 to use for irrigation purposes.
5. The Court finds that the additional 1987 data on Well I-11 submitted by URI to TCEQ in 2006, though the data was valid, should not have been used to calculate the use for Well I-11 for purposes of the Agreement. The Court finds that the submission of the additional data altered the restoration level for Well I-11. However, the Court finds that the submission of the additional data did not grant URI relief from the restoration table or the restoration range table (referenced in paragraph 1.7 of the Settlement Agreement), but did grant relief from the terms of the Settlement Agreement between the parties because this additional data on Well I-11 was not public data and *608 was not known to the County at the time of the execution of the Agreement; and thus, would not have been contemplated by the County at the time it entered the Agreement in 2004.
Regarding attorney's fees, the trial court found:
4. The Court finds that the request by the County for its attorney's fees, as submitted, does not segregate those fees incurred in proving up that portion of the claim related to the breach of paragraph 11.1, upon which it prevailed, in part, from all its other claims, upon which it did not prevail; and, the Court finds that the County did not segregate the attorneys' fees it incurred in those claims for which the County may have been eligible for fees, i.e., declaration of breach from those claims for which it was not eligible to receive attorneys' fees, i.e., unjust enrichment.
5. Further, the Court finds that the County did not prevail entirely on any claim for breach of contract or for declaration of breach or for unjust enrichment or specific performance.
....
12. The Court finds that URI has segregated those fees it incurred attributable to its case-in-chief and to the portion of that claim upon which URI prevailed. The Court, in its discretion, does not award attorney's fees to URI as the Court finds URI did not prevail on its claim in its entirety and the Court has granted equitable relief sufficient to allow URI to continue to mine in the permitted area while it continues restoration of PAA1.
III. URI-WELL I-11 RESTORATION
URI argues that the trial court erred by finding that the 1987 data should not have been used to determine the level of well I-11's water quality restoration. URI asserts that the settlement agreement allowed the use of the 1987 data since the data was collected prior to any mining activities. Resolving this issue requires interpreting the Settlement Agreement.
A. Standard of Review & Applicable Law
The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review. See Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc., 297 S.W.3d 248, 252 (Tex. 2009) ; Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999). When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless. Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006) ; Stine v. Stewart, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." Coker, 650 S.W.2d at 393. Courts may consider evidence on the facts and circumstances surrounding the instrument's execution. Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981). If, in the surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Id. Consideration of the facts and *609 circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. Id.
B. Analysis
The parties dispute the meaning of section 11.1 of the Agreement. URI argues that the language of section 11.1 allows for the use of the 1987 data in determining if URI met its restoration obligation since it was data "for which baseline is available before mining beg[an]." URI argues that the 1987 sample-showing that well I-11 was unsuitable for any purpose-was obtained prior to any mining activities. Since the 1987 data predated mining by approximately a year and a half, URI claims that the 1987 data is equally, if not more, representative of the water quality of well I-11 before mining began. URI further asserts that the agreement did not intend the data used to determine suitability would be static. If that were the case, the Agreement would have specified the exact data to be used or listed the wells and level of restoration required.
In response, Kleberg argues that the County Commissioners, who approved that agreement, were only given the 1985 data and were unaware of the 1987 data. Since the 1985 data showed well I-11 as being suitable for irrigation, the County Commissioners wanted to restore the well to the same level of suitability. Kleberg asserts that the purpose behind paragraph 11.1 was to ensure that URI restore the aquifer to a higher standard than the TCEQ required. Kleberg also argues that URI's interpretation renders paragraph 11.1 a nullity because Kleberg would be unable to hold URI to a higher standard than TCEQ-frustrating the purpose of the settlement agreement.[7]
The plain language of paragraph 11.1 of the Agreement states that before URI resumes mining in PAA-3, URI must restore 90% of the sampled wells for which a pre-mining baseline is available that were suitable for either drinking water, livestock water, or irrigation before mining commenced to suitability for that use.[8] It does not refer to any particular sample, or even a single sample. The problem with this approach is the necessary assumption that the chemical composition of the well (such as uranium) is static. However, according to the 1985 and 1987 sample disparities of the chemical composition, it is not. Therefore, we conclude that the Agreement allows for the use of only the 1985 well sample.
The trial testimony shows that the Commissioners adopted paragraph 11.1 in order to have the wells restored to a "higher level" than required by TCEQ. While the "higher level" is undefined, it is clear the Commissioners contemplated that the "higher level" would either be drinking water, livestock water, or irrigation water. Further, it is undisputed that the 1985 data showed that only one well-I-11-was suitable for any purpose. Since the agreement requires 90% of the wells in PAA-1 that were suitable for either drinking water, livestock water, or irrigation to be returned to that state prior to mining *610 PAA-3, it necessarily contemplates that at least one well must be suitable.
Incorporating the 1987 sample data would mean that none of the wells in PAA-1 were suitable for any use, and consequently, any requirement for URI to restore wells to either drinking water, livestock water, or irrigation purposes before mining PAA-3 would be meaningless. See Seagull Energy E & P, Inc., 207 S.W.3d at 346. Since incorporating the 1987 sample data would render the intended safeguards of paragraph 11.1 meaningless, we disagree with URI that the Agreement allows the use of the 1987 well sample data. URI's issue is overruled.
IV. ATTORNEY'S FEES
By its first and second issues, Kleberg argues it is entitled to an award of attorney's fees and costs.[9] Kleberg asserts that it satisfied all requisites for attorney's fees because it prevailed on its breach of contract claim, received nominal damages, and obtained "something of value" on its breach of contract claims.
A. Standard of Review
We review a trial court's award of attorney's fees based on breach of contract for an abuse of discretion. Weaver v. Jamar, 383 S.W.3d 805, 813 (Tex.App.-Houston [14th Dist.] 2012, no pet.) ; see Llanes v. Davila, 133 S.W.3d 635, 640 (Tex.App.-Corpus Christi 2003, pet. denied) (citing Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 881 (Tex. 1990) (per curiam)). The test for an abuse of discretion is whether the trial court's decision was arbitrary or unreasonable. Id. The trial court may consider the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. Rapid Settlements, Ltd. v. Settlement Funding, LLC, 358 S.W.3d 777, 786 (Tex.App.-Houston [14th Dist.] 2012, no pet.).
B. Applicable Law
Texas law provides that there can be no recovery of attorney's fees unless authorized by contract or statute. In re Nalle Plastics, 406 S.W.3d 168, 172 (Tex. 2013) (citing Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310-11 (Tex. 2006) ). In accordance with that rule, the Legislature specifically designates when attorney's fees may be recovered and, in doing so, distinguishes between attorney's fees and damages. Id. Texas Civil Practice and Remedies Code chapter 38, the primary statute governing fees, allows a prevailing party to "recover reasonable attorney's fees ... in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." Id. (citing TEX. CIV. PRAC. & REM. CODE § 38.001 ).
To recover attorney's fees under this statute, a party must first prevail on the underlying claim and recover damages. Id. at 173 (citing MBM Fin. Corp. v. Woodlands Operating Co., L.P., 292 S.W.3d 660, 666 (Tex. 2009) ). The second requirement is implied from the statute's language: for a fee recovery to be 'in addition to the amount of a valid claim,' the claimant must recover some amount on that claim. Id.
A "valid claim" under section 38.001(8) is not limited to a claim for monetary damages.
*611 Butler v. Arrow Mirror & Glass, 51 S.W.3d 787, 797 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Instead, it includes any claims for which the party recovers "at least something of value." Id. (quoting Rodgers v. RAB Ins., Ltd., 816 S.W.2d 543, 551 (Tex.App.-Dallas 1991, no writ) ). An award of specific performance under a contract is something of value. See Id. (injunction enforcing covenant not to compete was something of value); Rasmusson v. LBC PetroUnited, Inc., 124 S.W.3d 283, 287 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (award of specific performance permitted recovery of attorney's fees under section 38.001 ).
A "prevailing party" is a party who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even if not to the extent of its original contention. See Dear v. City of Irving, 902 S.W.2d 731, 739 (Tex.App.-Austin 1995, writ denied) ("[A] prevailing party is one who is vindicated by the judgments rendered."); Gar Gil, L.L.C. v. Benson, No. 13-08-00432-CV, 2009 WL 1801493, *5 (Tex.App.-Corpus Christi June 25, 2009, no pet.) (mem. op.). Determining whether a party is the prevailing or successful party must be based upon the success on the merits and not on whether or not damages were awarded. Head v. U.S. Inspect DFW, Inc., 159 S.W.3d 731, 749 (Tex.App.-Fort Worth 2005, no pet.) ; Scholl v. Home Owners Warranty Corp., 810 S.W.2d 464, 468 (Tex.App.-San Antonio 1991, no writ) ; Perez v. Baker Packers, 694 S.W.2d 138, 143 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.) (noting that lawsuits are not, at their core, about the recovery of damages; they are about the vindication of a civil claim on the merits).
C. Analysis
Kleberg argues that it was the prevailing party on its breach of contract claim and recovered something of value. Though it concedes that it did not prevail on every breach of contract theory, Kleberg maintains it is entitled to attorney's fees because it prevailed on one breach of contract theory and was granted partial specific performance along with nominal damages.
URI argues Kleberg was not the prevailing party because it lost on the main issue-whether URI was required to cease mining operations in PAA-3. URI further disputes Kleberg's characterization of the trial court's judgment as specific performance. Instead, according to URI, the trial court rejected Kleberg's specific performance request because the trial court declined to bar URI from resuming mining in PAA-3. In support of its argument, URI points to a portion of the record where Kleberg's attorney stated that "we are not asking for specific performance that URI clean up well I-11. We are asking that specific performance-that they not be allowed to re-mine production area three." This statement, according to URI, is proof that the core of the dispute was whether URI was required to stop mining in PAA-3. We disagree.
In order to conclude that this one statement from Kleberg's attorney represents the "core dispute" requires us to disregard the parties' pleadings and a substantial portion of the testimony and evidence produced at trial. URI's own pleadings sought a declaration that "URI had satisfied the requirements of § 11.1 of the Settlement Agreement to resume mining in Production Area 3 of URI's Kingsville Dome Mine." Contrary to URI's position, the litigation centered on whether URI breached the agreement, resulting in the wrongful commencement of mining.
In Flagship Hotel, Ltd. v. City of Galveston, the court was asked to determine which party was the prevailing party. See *612 117 S.W.3d 552, 564 (Tex.App.-Texarkana 2003, pet. denied). In Flagship Hotel, the plaintiff, Flagship Hotel, Ltd., brought four allegations of breach of contract in a lawsuit over the rights and responsibilities under a lease agreement between Flagship Hotel, Ltd. and the City of Galveston. Id. at 564. Flagship Hotel, Ltd. prevailed on only one of the four allegations. Id. In finding that Flagship Hotel was a prevailing party, and thus entitled to attorney's fees, the court noted that other appellate courts have only considered whether a party prevailed on the main issue where both parties received judgment under the cause of action, i.e., where both parties breached the contract. Id.
We agree with our sister court that the proper focus is on whether an agreement was breached. Kleberg is the prevailing party because Kleberg was the only party that pled for, and prevailed on, a breach of contract action and an action for specific performance. See id. ; see also City of Amarillo v. Glick, 991 S.W.2d 14, 17 (Tex.App.-Amarillo 1997, no pet.) (concluding plaintiffs prevailed on main issue even though they did not receive all requested relief).
We now turn to the question of whether Kleberg recovered "something of value." URI asserts that Kleberg did not receive any of the relief it requested other than nominal damages. URI points out that Kleberg was seeking specific performance to require URI to cease mining in PAA-3. Again, this argument ignores the pleadings and evidence. Specifically, Kleberg requested an order for specific performance barring mining in PAA3 unless and until well I-11 was returned to suitability. In that regard, the trial court awarded Kleberg partial specific performance, ordering URI to restore I-11 to suitability for irrigation purposes, but allowed URI to continue mining in PAA-3.
The doctrine of partial specific performance of a contract is well recognized in the state of Texas. English v. Jones, 154 Tex. 132, 274 S.W.2d 666 (1955) ; Walzem Dev. Co., Inc. v. Gerfers, 487 S.W.2d 219, 221 (Tex.App.-San Antonio 1972, writ ref'd n.r.e) ; Villarreal v. De Montalvo, 231 S.W.2d 964 (Tex.Civ.App.-San Antonio 1950, no writ) ; Dittoe v. Jones, 220 S.W.2d 315 (Tex.Civ.App.-Fort Worth 1949, writ ref'd n.r.e.) ; Ward v. Walker, 159 S.W. 320 (Tex.Civ.App.-Galveston 1913, writ ref'd). Since the award of specific performance supports an award of attorney's fees, we see no reason why the award of partial specific performance would not as well. See Rasmusson, 124 S.W.3d at 287 (citing Jones v. Kelley, 614 S.W.2d 95, 96, 100-01 (Tex. 1981) (reforming judgment to award attorney's fees, in accordance with jury verdict, under predecessor statute to section 38.001 in suit for specific performance of earnest money contract for sale of real estate)).
Kleberg also argues that its failure to segregate its attorney's fees is not a valid basis to bar the recovery of attorney's fees. Kleberg is correct. See Chapa, 212 S.W.3d at 314 (failure to segregate attorney's fees does not prevent recovery of attorney's fees). Kleberg further argues that they should not be required to segregate since its claims for breach of contract overlapped its claims for declaratory judgment.
In Chapa, the Texas Supreme Court held that the rule is that only when discrete legal services advance both a recoverable and unrecoverable claim that are so intertwined, then they need not be segregated. Id. at 313-14. In Chapa, the plaintiff brought claims for breach of contract, fraud, and violation of Deceptive Trade Practices. Id. at 303. A cause of action for fraud does not permit the recovery *613 of attorney's fees. See Id. at 311 (citing Travelers Indem. Co. of Connecticut v. Mayfield, 923 S.W.2d 590, 594 (Tex. 1996) ). Finding that at least some of the awarded attorney's fees were attributable only to the fraud claim, and therefore not recoverable, the court remanded the case to the trial court for segregation of the attorney's fees. See Chapa, 212 S.W.3d at 314.
Unlike in Chapa, Kleberg brought claims for breach of contract and declaratory judgement; both of which allow for the recovery of attorney's fees. See TEX. CIV. PRAC. & REM. CODE §§ 38.001, 37.009. Since Kleberg only brought claims that permit the recovery of attorney's fees, we conclude that it was not required to segregate fees. Given that Kleberg was the prevailing party and recovered something of value, we further conclude that the trial court abused its discretion in failing to award Kleberg's attorney's fees. See Flagship, 117 S.W.3d at 564 ; Rasmusson, 124 S.W.3d at 287. Kleberg's first issue is sustained.
V. SPECIFIC PERFORMANCE
By its second issue, Kleberg argues the trial court erred in adding language to its judgment for specific performance modifying the terms set forth in the settlement agreement.[10] Specifically, Kleberg asserts that because it performed its obligations under the settlement agreement, it is entitled to specific performance. Kleberg also asserts that the trial court incorrectly found that prohibiting URI from mining PAA-3 until well I-11 was restored would not allow URI the financial resources to complete the restoration.
A. Standard of Review
We review a trial court's award of specific performance for an abuse of discretion. See Edwards v. Mid-Continent Office Distribs. L.P., 252 S.W.3d 833, 836 (Tex.App.-Dallas 2008, pet. denied). We will not disturb a trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles. See Cire v. Cummings, 134 S.W.3d 835, 838 (Tex. 2004). When a trial court makes written findings of fact following a non-jury trial, these assist in our review of the trial court's exercise of its discretion by revealing the trial court's reasoning and analysis and help assure both the reviewing court and the litigants that the trial court's decision resulted from thoughtful deliberation. See Williams v. Chisolm, 111 S.W.3d 811, 815 (Tex.App.-Houston [1 st Dist.] 2003, no pet.). If the evidence is sufficient to support the trial court's findings and conclusions, the trial court did not abuse its discretion. See Reese v. Duncan, 80 S.W.3d 650, 659 (Tex.App.-Dallas 2002, pet. denied) ; El Paso County Hosp. Dist. v. Gilbert, 64 S.W.3d 200, 203-04 (Tex.App.-El Paso 2001, pet. denied).
B. Applicable Law
Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract. Paciwest, Inc. v. Warner Alan Props., LLC, 266 S.W.3d 559, 571 (Tex.App.-Fort Worth 2008, pet. denied). Specific performance is not a separate cause of action, but rather is an equitable remedy used as a substitute for monetary damages when damages would not be adequate. Paciwest, 266 S.W.3d at 571 ; Stafford v. S. Vanity Magazine, Inc., 231 S.W.3d 530, 535 (Tex.App.-Dallas 2007, pet. denied).
Because specific performance is an equitable remedy available only when *614 the legal remedy of damages is insufficient, when one brings a breach of contract suit, one must elect to sue for either money damages or specific performance. See Carrico v. Kondos, 111 S.W.3d 582, 588 (Tex.App.-Fort Worth 2003, pet. denied) ; Shelton v. Poynor, 326 S.W.2d 583, 585 (Tex.Civ.App.-El Paso 1959, writ dism'd). When the non-breaching party sues for specific performance, then it affirms the contract and requests the court to effectuate the agreement. Byram v. Scott, 2009 WL 1896076, at *3 (Tex.App.-Austin 2009) ; see Hamon v. Allen, 457 S.W.2d 384, 391-92 (Tex.Civ.App.-Corpus Christi 1970, no writ). The Texas Supreme Court has said:
[C]ourts cannot arbitrarily refuse specific performance of a contract, because they deem it unwise, or because subsequent events disclose that it will result in a loss to defendant; but to justify the refusal of this relief it must appear that the defendant had been misled and overreached to such an extent that the contract is unconscionable.
Claflin v. Hillock Homes, Inc., 645 S.W.2d 629, 633 (Tex.App.-Austin 1983, writ ref'd n.r.e.) (citing Bennett v. Copeland, 149 Tex. 474, 235 S.W.2d 605, 609 (1951) ).
C. Analysis
We first address the issue of whether Kleberg is entitled to specific performance. During trial, when asked whether mining PAA-3 was necessary in order to accomplish restoration, URI's vice president testified: "I just can't say whether it was necessary. It's a practical and I guess logical conclusion that if you've got revenues flowing from a variety of sources, those revenues all look the same in terms of funding other projects." Regarding whether or not URI could restore well I-11, URI's vice president stated: "I'll say it would be difficult. It would require some additional steps, but I believe we could get the job done." The record also indicates that URI posted a bond meant for well restoration activities.
Regardless of the difficulty of restoring well I-11, the profitability of such operations is of little concern. The record does not show URI was misled or overreached or that granting Kleberg's contractual remedy of specific performance would be unconscionable. See Claflin, 645 S.W.2d at 633. Therefore, we agree with Kleberg that specific performance is an appropriate remedy.
Next, we turn to Kleberg's argument that the trial court had no power to modify the terms of the agreement. Kleberg contends that the record fails to support the trial court's conclusion that URI would be unable to restore well I-11 without continuing mining in PAA3. We note that a decree for specific performance of a contract is not a matter of absolute right but rests in the sound discretion of the trial court. Walzem, 487 S.W.2d at 222. Additionally, in order to be specifically enforceable, a contract must be complete in its essential and material terms, parts and elements; it must be capable of being performed without adding to its terms. Id. While a court may not pull the terms of a contract from thin air, a court may grant specific performance when the contract is capable of performance without adding terms. See Hubler v. Oshman, 700 S.W.2d 694, 699 (Tex.App.-Corpus Christi 1985, no writ).
As we previously discussed, the record contains no information regarding the costs of restoring well I-11 or that URI is unable to complete the restoration prior to mining PAA3. Even if URI is unable to pay for the cost of the restoration, we agree with Kleberg that a miscalculation is not a sufficient ground for the court to excuse a party from specific performance *615 of a contract term. See Claflin, 645 S.W.2d at 634. Therefore, we conclude that the trial court abused its discretion by ordering specific performance inconsistent with the terms of the settlement agreement. Walzem, 487 S.W.2d at 222 ; Claflin, 645 S.W.2d at 634. Kleberg's second issue is sustained.
VI. AQUIFER WATER TREATMENT
By its third issue, Kleberg claims the trial court erred by denying relief on its claims that URI failed to treat aquifer water at a rate of 240 million gallons per year.[11] Specifically, Kleberg asserts the trial court incorrectly allowed URI to use a formula for a treatment rate that was inconsistent with the plain language of the Settlement Agreement. Kleberg further asserts that URI did not prove that force majeure prevented it from treating 240 million gallons per year.
A. Settlement Agreement Treatment Rate
Kleberg first argues that the Agreement does not allow URI to count waste disposal water not derived from the aquifer that was discarded down the disposal well. Kleberg asserts that URI's method for calculating treated water includes additional sources of water that does not come from the aquifer such as rainwater, restoration wastes, and lab waste, among others. This additional water can inflate the disposal well waste water which then inflates the amount of "treated" aquifer water. According to Kleberg, under the Agreement, "treatment" consists of putting water through the reverse osmosis (RO) system, and the "treatment rate" is the quantity of groundwater, measured in gallons, fed to the RO system per unit of time.
URI argues that reading section 1.5(1) with 1.4 requires the disposal liquids from all sources, not just the RO system, to count toward the total 240 million gallon treatment requirement. URI claims that, contrary to Kleberg's argument, liquids in the disposal wells are relevant to the treatment rate; otherwise there is no reason for paragraph 1.4 to reference paragraph 1.5(1).
1. Standard of Review & Applicable Law
Our analysis requires us to interpret various provisions and definitions in the Agreement. As previously noted, unambiguous contract interpretation is a question of law for the court, which we may consider pursuant to a de novo standard of review. See Coker, 650 S.W.2d at 393 ; Chrysler Ins. Co., 297 S.W.3d at 252.
2. Analysis
We agree with Kleberg's interpretation. The Agreement requires URI to restore groundwater in mine zones PAA-1 and PAA-2 at a treatment rate of at least 240 million gallons per year, all to be recorded and reported as provided for in paragraph 1.5(1). "Treatment" is defined in the Agreement as treatment by (a) running the groundwater through URI's reverse osmosis (RO) system; (b) reinjecting the "clean" water from the RO system into the aquifer being restored; and (c) injecting the "dirty" or "reject" water from the RO system into URI's disposal well (emphasis added). Paragraph 1.5(1) requires URI to make and maintain records of the rates and amounts of pumping of contaminated ground water and the disposal of liquids in any disposal well(s) on at least a weekly *616 basis. Reading paragraphs 1.4 and 1.5(1) in conjunction means that URI must keep separate records of contaminated groundwater and disposal liquids, but does not say that URI may-for the purposes of calculating treatment-include sources of water outside of the aquifer. Including such additional sources would raise the amount of disposal liquid. When that disposal liquid amount is added to the volume of clean water reinjected into the aquifer, it would give a false impression that URI is treating a larger volume of water than it is actually treating.
URI claims that this method of calculation is "industry practice" that we must consider. See Oil Ins. Ass'n v. Royal Indem. Co., 519 S.W.2d 148, 151 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.) (explaining that evidence of a general custom is admissible to add to a contract that is silent on a particular matter). However, other than citing to a portion of Kleberg's pleading stating that the TCEQ uses the same calculation method, URI provides no citation to evidence in the record that its calculations are industry practice. Moreover, even if they are, the Agreement is not silent. See Cook Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 132-33 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd) ("Given this express term of the contract, we cannot conclude that Westlake and CCP intended to follow the stated "industry practice[.]" "). The Agreement plainly sets forth what treatment means: groundwater into the RO system, clean water and dirty water out. It defies the explicit terms of the agreement that rainwater and sources other than groundwater can factor into a calculation for treating groundwater.
We conclude that the trial court was incorrect in holding that the Agreement allowed for water from other sources to be measured as part of URI's groundwater treatment. To this extent, we sustain Kleberg's third issue.
B. Force Majeure
In its third issue, Kleberg also argues that URI did not prove that force majeure prevented it from treating 240 million gallons of water per year. Specifically, Kleberg asserts: (1) URI failed to provide force majeure notices required under the terms of the settlement agreement; (2) the evidence was legally insufficient to prove that force majeure events substantially affected URI's treatment obligations; and (3) the evidence was legally insufficient to support a finding that URI proved the affirmative defenses of estoppel, waiver, and laches.
1. Standard of Review
Challenges to the legal sufficiency of the evidence must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact. See Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). In reviewing legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fairminded people to differ in their conclusions. See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). In a legal sufficiency review, "all the evidence is reviewed in the light most favorable to the finding." Bianchi v. State, 444 S.W.3d 231, 245 (Tex.App.-Corpus Christi 2014, no pet.) (citing State v. K.E.W., 315 S.W.3d 16, 25-26 (Tex. 2010) ).
2. Applicable Law *617 "Force majeure" is a term that describes a particular type of event which may excuse performance under a contract. See R & B Falcon Corp. v. Am. Exploration Co., 154 F.Supp.2d 969, 974 (S.D. Tex. 2001) (citing Perlman v. Pioneer Ltd. Partnership, 918 F.2d 1244, 1248 n. 5 (5th Cir. 1990) ). To determine whether a certain event excuses performance, a court should look to the language that the parties specifically bargained for in the contract to determine the parties' intent, rather than resorting to any traditional definition of the term. Id. Contractual terms are controlling regarding force majeure with common law rules merely filling in gaps left by the document. See Sun Operating Ltd. v. Holt, 984 S.W.2d 277, 283 (Tex.App.-Amarillo 1998, no pet.). "In other words, when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." Id.
3. Force Majeure Notices
Paragraph nine of the Agreement requires URI to notify "Kleberg County" of any force majeure events. These events include "any Act of God, war, strike, hot, electrical outage, fire, explosion, flood, blockade, governmental action, or other catastrophe." The notice provision in paragraph five of the Agreement requires that "any notices or other communications ... must be made in writing...." Paragraph 5 further requires that notices "shall be given" to the Kleberg County Judge and Richard Lowerre.
It is undisputed that URI only delivered the force majeure notices to the county judge. Kleberg asserts that since URI breached the Agreement's notice requirements, URI should be precluded from asserting force majeure conditions. However, we decline to take such a harsh position.
In Matador, the court found that there was no evidence that the drilling contractor (Matador) ever notified the operator (Post) that it was claiming a force majeure event. See Matador Drilling Co. v. Post, 662 F.2d 1190, 1198 (5th Cir. 1981). Under the facts of that case, the court concluded that the failure to prove a necessary condition of recovery-notice-was sufficient to make the force majeure clauses unavailable.
In the instant case, however, the Agreement requires force majeure notices to be in writing and delivered to both the county judge and Richard Lowerre. Unlike Matador, where no force majeure notices were sent, URI did send force majeure notices, albeit to only one person. See ids="1185454" index="90" url="https://cite.case.law/f2d/662/1190/#p1198">id. Because URI did send some force majeure notices, we conclude the force majeure clause is available to URI as an affirmative defense. Consequently, we turn to Kleberg's claim that the evidence was legally insufficient to prove force majeure events substantially affected URI's treatment obligations.
4. Force Majeure Events
Kleberg lists five events that URI characterized as force majeure and argues that URI failed to prove that it missed its restoration obligations solely due to a force majeure event. In 2005, URI claimed force majeure due to a failed disposal well pump. In 2006, URI claimed two force majeure events due to failure of disposal well casing and flooding, respectively. In 2007, URI claimed three force majeure events: two failures of the injection well pump and a power outage. In 2008, URI claimed one force majeure event due to a failure of membranes on its reverse osmosis system. In 2011, URI claimed two force majeure events due to power failures.
*618 Our analysis of this issue requires us to interpret the force majeure provision of the Agreement, which states:
URI shall not be deemed to have failed to meet any obligation under this agreement if URI's performance or failure to perform or delay in performance has been caused by any Act of God, war, strike, riot, electrical outage, fire, explosion, flood, blockade, governmental action, or other catastrophe (hereafter, "force majeure"). In the event of the occurrence of any event or events which constitute a "force majeure," URI shall notify Kleberg County as soon as practicable of such occurrence or occurrences. This Paragraph shall not apply to the obligations set out above in Paragraphs 1.1, 1.2, and 1.3 of this Agreement. (emphasis added)
Although Kleberg asserts that force majeure clause is not meant to include mechanical failures and instead covers situations "beyond URI's power to anticipate and control," there is no such language in the agreement. The Agreement lists specific events such as any Act of God, war, strike, riot, electrical outage, fire, explosion, flood, blockade, governmental action to trigger the force majeure clause, and the clause goes even further to include a catch-all provision that also covers "other catastrophe[s]." "Catastrophe" is not defined in the Agreement, and in the absence of a specific definition, we give words their plain, ordinary meanings. See Gonzalez v. Mission Am. Ins. Co., 795 S.W.2d 734, 736 (Tex. 1990). The word catastrophe has a plain and ordinary meaning: a momentous tragic event or an utter failure. See V.L. Props., Inc. v. Alleghany Underwriting Risk, 130 Fed. Appx. 675, 676 (5th Cir. 2005) (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 179 (10th ed. 2002)). We can reasonably interpret, under the specific facts and Agreement of this case, that "catastrophe" includes equipment failure that prevents URI from performing groundwater restoration.
While URI did not specify which part of the force majeure paragraph the equipment failures fall under, it is arguable that these particular failures are catastrophic. The record indicates that the mechanical problems, rather than being routine and simple, were specialized and complex. Moreover, it is apparent from the record that URI's equipment failures prevented it from performing restoration. Therefore, we conclude that URI's force majeure events fell under the terms of the Agreement.
Kleberg further argues that URI failed to prove that its failure to meet its treatment obligations at the agreed rate was caused by the force majeure events. This is not what the Agreement requires. The Agreement states that "URI shall not be deemed to have failed to meet any obligation under this agreement if URI's performance or failure to perform or delay in performance has been caused by...." (emphasis added). The causation is linked to a failure to perform which in turn obviates URI's treatment obligations. As discussed above, URI's claimed force majeure events prevented it from performing groundwater restoration. As a result, we conclude that URI presented evidence that is legally sufficient to prove that its performance or failure to perform or delay in performance was caused by force majeure events. We need not reach the merits of URI's other affirmative defenses. We overrule the remainder of Kleberg's third issue.
VII. NOTICES
By its fourth issue, Kleberg argues that URI breached its duty to provide written notices to Kleberg's attorney, Richard *619 Lowerre.[12] Specifically, Kleberg argues that the trial court used the wrong legal standard in finding that URI substantially performed the notice and service requirements of the [a]greement by serving the documents only on the Kleberg County Judge. In that regard, Kleberg contends the proper legal standard is that the "parties to an agreement are entitled to an exact performance of the agreement." In addition, Kleberg argues that there is no evidence to support URI's affirmative defenses of laches, waiver, estoppel, and failure to mitigate.
A. Performance of a Contract
1. Standard of Review
We review legal conclusions de novo. See City of Pasadena v. Gennedy, 125 S.W.3d 687, 691 (Tex.App.-Houston[1st Dist.] 2003, pet. denied) (citing In re Humphreys, 880 S.W.2d 402, 404 (Tex. 1994) ("[Q]uestions of law are always subject to de novo review.")).
2. Applicable Law
Unambiguous contracts are construed as a matter of law. Coker, 650 S.W.2d at 393. "The entire instrument, taken by its four corners, must be read and considered to determine the true intention of the parties." Dedier v. Grossman, 454 S.W.2d 231, 234 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.) ; see Cook Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 132 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd.).
A plaintiff asserting breach of contract must establish, inter alia, (1) the existence of the contract sued upon; (2) his compliance with the terms of the contract or that he was ready, willing, and able to comply but has a valid excuse for his nonperformance; and (3) the defendant's breach of the contract. See Incorporated Carriers, Ltd. v. Crocker, 639 S.W.2d 338, 340 (Tex.App.-Texarkana 1982, no writ) ; Howell v. Kelly, 534 S.W.2d 737, 740 (Tex.Civ.App.-Houston [1st Dist.] 1976, no writ).
The substantial performance doctrine originated and is still mostly used in the context of construction contracts. See Vance v. My Apartment Steak House, Inc., 677 S.W.2d 480, 482 (Tex. 1984) ; Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 164 (Tex. 1982) ; RAJ Partners, Ltd. v. Darco Constr. Corp., 217 S.W.3d 638, 643 (Tex.App.-Amarillo 2006, no pet.) ; Beard Family P'ship v. Commercial Indem. Ins. Co., 116 S.W.3d 839, 844 (Tex.App.-Austin 2003, no pet.) ; see also Ten-Booms v. Obregon, No. 03-09-00713-CV, 2011 WL 2162884, *7 (Tex.App.-Austin June 3, 2011, no pet.). However, substantial performance can also be used as a defense to other breach of contract claims. See Smith v. Smith, 112 S.W.3d 275, 279 (Tex.App.-Corpus Christi 2003, pet. denied) ; see also Avnsoe v. Square 67 Dev. Corp., 521 S.W.2d 874, 874-75 (Tex.Civ.App.-Eastland 1975, no pet.) (substantial performance as defense); Cotherman v. Oriental Oil Co., 272 S.W. 616, 618 (Tex.Civ.App.-Amarillo 1925, no writ) (same); Adams v. Tri-Continental Leasing Corp., 713 S.W.2d 152, 153 (Tex.App.-Dallas 1986, no writ) (same). In determining substantial performance, there must be no willful departure from the terms of the contract and no omission of essential points of the project. Smith, 112 S.W.3d at 279 ; see Cotherman, 272 S.W. at 619 ;
*620 Uvalde Rock Asphalt Co. v. Fantham, 210 S.W.2d 646, 650 (Tex.Civ.App.-Galveston 1948, no writ). The party seeking relief under the doctrine bears the burden of proving that it did substantially perform in accordance with the agreement. Smith, 112 S.W.3d at 279 ; see Patel v. Ambassador Drycleaning & Laundry Co., Inc., 86 S.W.3d 304, 307 (Tex.App.-Eastland 2002, no pet.) (citing Vance, 677 S.W.2d at 483 ).
3. Discussion
Kleberg's contends that the trial court failed to require exact performance of the Agreement and that the trial court incorrectly granted substantial performance to URI. In support of its argument, Kleberg cites Kitten v. Vaughn, 397 S.W.2d 530, 533 (Tex.Civ.App.-Austin 1965, no writ), which purportedly stands for the proposition that parties to an agreement are entitled to exact performance of the agreement. However, as we held in Smith and recognized by the Austin Court of Appeals, the doctrine of substantial performance has expanded and is now available in breach of contract cases. See Smith, 112 S.W.3d at 279 ; supra ; see also Ten-Booms v. Obregon, No. 03-09-00713-CV, 2011 WL 2162884, *7 (Tex.App.-Austin June 3, 2011, no pet.). The trial court correctly found that substantial performance was available as a defense to Kleberg's breach of contract allegations. See Smith , 112 S.W.3d at 279.
Moreover, Kleberg does not challenge the evidence URI presented in support of its substantial performance defense. In order to challenge URI's defense of substantial performance, Kleberg must identify those portions of the record that show URI willfully departed from the terms of the agreement or omitted essential points. See ids="9100253" index="119" url="https://cite.case.law/sw3d/112/275/#p279">id. Kleberg fails to identify any portion of the record which shows that URI deliberately departed from a material stipulation in the agreement pertaining to the delivery of the notices. Kleberg also does not argue that URI failed to meet its burden of proof in proving that they substantially performed in accordance with the notice provision of the Agreement. See Patel, 86 S.W.3d at 307.
Even if Kleberg had challenged the trial court's findings and conclusion, the record shows that Kleberg County intended for the Kleberg County Judge, as well as its attorney, to act as the point of contact with URI regarding the technical reports and force majeure notices. Regarding the force majeure notices, a county commissioner testified that it was the county judge's responsibility to respond. The Kleberg County Judge testified that URI consistently provided him with the required quarterly reports, and that the reports were available.
Considering only the evidence and inferences that tend to support the trial court's finding that appellee substantially complied with the settlement agreement and after disregarding all evidence and inferences to the contrary, see Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002), we conclude that URI established that there was no willful and material departure from the notice provisions of the agreement that would prevent substantial performance. Because there is evidence supporting the findings and conclusions of the trial court, we overrule Kleberg's fourth issue.
Kleberg's evidentiary challenges to URI's additional affirmative defenses of laches, waiver, estoppel, and failure to mitigate are not dispositive to this appeal; therefore, we decline to address them. See TEX.R.APP. P. 47.1.
VIII. CONCLUSION
We reverse the trial court's judgment and remand to the trial court for further proceedings consistent with this opinion.

The settlement agreement stemmed from Kleberg seeking a contested TCEQ hearing regarding URI's mining permit application.

Kleberg includes seven "unnumbered" issues in its section entitled "Issues Presented": (1) Did the trial court err when it refused to award Kleberg County reasonable attorney's fees even though Kleberg County prevailed on a breach of contract claim and was awarded nominal damages and specific performance; (2) When a party bringing a breach of contract claim on a single contract and prevails on one or more theories of breach, is the prevailing party entitled to recover attorney's fees incurred in attempting to recover on all the theories of breach and their remedies; (3) In granting specific performance, did the trial court have discretion to issue an order that significantly deviated from the terms of the contract on the grounds that this deviation would be more justly apportion the burdens of contractual obligations; (4) whether the water URI counted for purposes of calculating the volume of treated water was consistent with the definition of treated groundwater set forth in the Settlement Agreement; (5) Whether there was any evidence that force majeure events caused a failure by URI to treat aquifer water at the rate required by the Settlement Agreement; (6) As a matter of law, was Kleberg County obligated to mitigate or provide notice and an opportunity to cure to URI for its failure to provide notice and reports to Kleberg County's outside counsel Richard Lowerre; and (7) was URI entitled to equitable defenses and was there any evidence that URI's breach in failing to provide notice and reports to Kleberg County attorney Richard Lowerre was excused by estoppel, laches, or waiver. However, in its table of contents and corresponding argument, Kleberg organizes and addresses the issues differently. For clarity, we will address Kleberg's issues as they are outlined in their table of contents and addressed and fairly raised in the argument section of the brief.

Richard Lowerre contracted with Kleberg County to provide legal services in negotiating the settlement agreement. Mr. Lowerre was not a party in this lawsuit and did not testify at trial.

The trial court denied Kleberg's request for disgorgement of profits through a partial summary judgment that is not before us on appeal.

Well I-11A was drilled several feet away from well I-11 after the latter well "sanded in", failing to produce water. The two wells are treated as one in the same.

The trial court reduced each party's requested amount of attorney's fees.

The "recitals" section of the Agreement states that the parties to the agreement desired to compromise and settle all matters set for a hearing before the TCEQ and pending court. As noted in this opinion, Kleberg was seeking a hearing before the TCEQ on its granting of a mining permit to URI.

Since well I-11 was the only well in PAA-1 that was suitable for any use (according to the 1985 data), then URI would necessarily restore well I-11 to the same level of pre-mining suitability.

We restate and combine Kleberg's first and second "issues presented" into one single issue. See Tex.R.App. P. 38.1(f).

This issue corresponds with Kleberg's third "issue presented."

We restate and combine Kleberg's fourth and fifth "issues presented" into one single issue. See Tex. R. App. P. 38.1(f).

We restate and combine Kleberg's sixth and seventh "issues presented" into one single issue. See Tex.R.App. P. 38.1(f). We note that Kleberg does not address its sixth issue in the brief, however, we will address the issues as raised in the substance of the briefs argument section. See Perry v. Cohen, 272 S.W.3d 585, 587-88 (Tex. 2008).